John DOE, a minor, by his mother and next friend, Jane Doe, Plaintiff,

v.

KAMEHAMEHA SCHOOLS/BERNICE PAUAHI BISHOP ESTATE; and Constance H. Lau, Nainoa Thompson, Diane J. Plotts, Robert K.U. Kihune, and J. Douglas Ing, in their capacities as Trustees of the Kamehameha Schools/Bernice Pauahi Bishop Estate, Defendants.

No. CIV. 03–00316 ACK/LE.

United States District Court, D. Hawai'i.

Dec. 8, 2003.

---

John W. Goemans, Kamuela, HI, Eric Grant, James F. Sweeney, Sweeney & Grant LLP, Sacramento, CA, for John Doe, a minor, by his mother and next friend, Jane Doe nfr Jane Doe, plaintiff.

David Schulmeister, Kelly G. LaPorte, Cades Schutte Fleming & Wright, Honolulu, HI, Kathleen Sullivan, Stanford Law School, Special Deputy Corporation Counsel, Crown Quadrangle, Stanford, CA, Emmett B. Lewis, Jay L. Carlson, Miller & Chevalier, Washington, DC, for Kamehameha Schools/Bernice Pauahi Bishop Estate, Diane J. Plotts, in her capacity as Trustee of the Kamehmeha Schools/Bernice Pauahi Bishop Estate.

David Schulmeister, Crystal K. Rose, Bruce D. Voss, Bays Deaver Lung Rose & Baba, Honolulu, HI, Kathleen Sullivan, Stanford Law School, Special Deputy Corporation Counsel, Crown Quadrangle, Stanford, CA, Emmett B. Lewis, Jay L. Carlson, Miller & Chevalier, Washington, DC, for Constance Lau, in her capacity as Trustee of the Kamehameha Schools/Bernice Pauahi Bishop Estate, Nainoa Thompson, in his capacity as Trustee of the Kamehameha Schools/Bernice Pauahi Bishop Estate.

David Schulmeister, Cades Schutte Fleming & Wright, Honolulu, HI, Kathleen Sullivan, Stanford Law School, Special Deputy Corporation Counsel, Crown Quadrangle, Stanford, CA, Emmett B. Lewis, Jay L. Carlson, Miller & Chevalier, Washington, DC, for Robert K.U. Kihune, in his capacity as Trustee of the Kamehameha Schools/Bernice Pauahi Bishop Estate, J. Douglas Ing, in his capacity as Trustee of the Kamehameha Schools/Bernice Pauahi Bishop Estate, defendants.

Charleen M. Aina, Girard D. Lau, Office of the Atty. Gen.–Hawaii, Honolulu, HI, for State of Hawaii, amicus.

Allen K. Hoe, Honolulu, HI, for Kamehameha Schools Faculty Ass'n, Na Kumu O Kamehameha, Kamehameha Schools Alumni Ass'n–Oahu Region, Kamehameha Schools Alumni Ass'n–Bd. of Presidents, Na Pua A Ke Alii Pauahi, Inc., Amici.

Josephine H. Josephine Helelani Pauhi Rabago, Pro se, Waianae, HI.

## ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT WITH RESPECT TO DECLARATORY AND INJUNCTIVE RELIEF AND GRANTING DEFENDANTS' COUNTER–MOTION FOR SUMMARY JUDGMENT

KAY, District Judge.

### TABLE OF CONTENTS

SYNOPSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1145

**BACKGROUND** ........................................................1147

I. Factual Background ...............................................1147
 A. The Native Hawaiians .........................................1148
 B. The end of the Hawaiian Monarchy ............................1149
 C. The effect of western influence on the Native Hawaiians ....1150
 D. Congressional recognition of the need for reconciliation ...1151
 E. Kamehameha Schools and its admissions policy ...............1154

II. Factual Background of the Complaint............................1157

III. Procedural Background .........................................1158

**STANDARD** ..........................................................1158

**DISCUSSION** ........................................................1159

I. The Limited Issue Before the Court .............................1160

II. Section 1981 Permits Justifiable Race–Conscious Policies ......1164

III. Kamehameha Schools' Admissions Policy Comprises a Valid Race–Conscious
 Remedial Plan .................................................1165

IV. Section 1981 Should be Read Harmoniously with Congressional Policy ...........1172

**CONCLUSION** ........................................................1174

### SYNOPSIS

Before the Court is a case involving exceptionally unique historical circumstances. It concerns the Kamehameha Schools, which was founded under a "charitable testamentary Trust established by the last direct descendant of Hawaii's King Kamehameha I, Princess Bernice Pauahi Bishop, who left her property in trust for a school dedicated to the education and upbringing of Native Hawaiians." *Burgert v. Lokelani Bernice Pauahi Bishop Trust,* 200 F.3d 661, 663 (9th Cir.2000). Kamehameha Schools is a private entity; it receives no state or federal funding. From a historical perspective, the Kamehameha Schools was established before Hawaii became a part of the United States.

Plaintiff John Doe, a non-Native Hawaiian minor, asserts that he was denied admission to Kamehameha Schools because of his race. He therefore claims that Kamehameha Schools' admissions policy, which grants a preference to children of Native Hawaiian ancestry, the indigenous people of Hawaii, violates 42 United States Code Section 1981.[1]

■ Defendants, however, argue that the admissions policy comprises a valid, race-conscious remedial affirmative action plan, and thus serves a legitimate purpose. They argue that the policy therefore does not violate § 1981.[2]

1. Section 1981, which originated in the Civil Rights Acts of 1866 and 1870, prohibits purposeful discrimination based solely on race, ancestry, or ethnic characteristics in the making or enforcement of contracts by private or government entities.

2. Although § 1981 applies to both governmental and private actors, the Equal Protection Clauses of the Fifth and Fourteenth Amendments do not apply to Kamehameha Schools because it is a private institution that does not receive federal funding. Under the framework which courts apply to private employers, race-conscious remedial plans may serve a legitimate purpose and therefore rebut the inference of racial discrimination raised by a prima facie violation of § 1981 or Title VII of the Civil Rights Act of 1964.

The parties agree that disposition by summary judgment is appropriate, and also agree that the limited issue before the Court is whether Kamehameha Schools has a "legitimate justification" for its admissions policy. The Court notes that Plaintiff does not dispute any of the facts submitted by Defendants.

No reported case addresses whether § 1981 permits the remedial use of race by a private school that receives no federal funding, especially one involving an educational preference for descendants of an indigenous people who have been disadvantaged by past history. The parties agree this is a case of first impression.

In *Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court held that claims of racial discrimination under § 1981 are subject to the same scheme of proof as applicable to Title VII cases. The Title VII framework consists of a two-step test that first looks to whether the use of race is supported by legitimate justification and then considers whether the use of race is reasonably related to that justification. The Title VII standard is not a fixed and rigid formula but rather a flexible one.

The Court finds that Kamehameha Schools has a legitimate justification for its admissions policy, which serves a legitimate remedial purpose, and that the policy reasonably relates to this purpose. The intent of Princess Pauahi, as explained through her husband Charles R. Bishop, Chairman of the original Board of Trustees, was that preference be given to Native Hawaiians for admittance to the Kamehameha Schools in order that through proper education they might be competitive with newcomers to Hawaii in maintaining their socioeconomic status, culture, and participate in the governance of their communities. Pauahi's vision, in sum, was to save her people through education.

The preference provided by the admissions policy is not perpetual nor an absolute bar to the admittance of other races to Kamehameha Schools. Kamehameha Schools reviews its admissions policy on a periodic basis to ensure its consistency with its mission and objectives in attaining the goals set out by Princess Pauahi. The most recent review took place in 2002. The preference was envisioned to last only for so long as it took Kamehameha Schools to fulfill its responsibility in educating Native Hawaiians to overcome the manifest imbalance resulting from socioeconomic and educational disadvantages, or at such earlier date when the Schools has the capacity to also admit non-Native Hawaiians. At present, Kamehameha Schools can enroll only a fraction of the 70,000 children of Native Hawaiian ancestry in the State of Hawaii.

Moreover, Congress has made repeated findings in numerous laws declaring that the Hawaiian Monarchy was unlawfully overthrown with the aid of the United States. Congress additionally has made legislative findings that the United States has a special trust obligation and political relationship to Native Hawaiians as the indigenous people of Hawaii. The Court does not address the merits of the differing views of the events surrounding the overthrow of the Hawaiian Monarchy but only recounts the 1893 events as understood by Congress. In 1993, Congress issued an acknowledgment and apology known as the Apology Resolution whereunder Congress acknowledged the United States' wrongful participation in the overthrow and sought a reconciliation with the Native Hawaiian people.

In 2002, Congress re-enacted the Native Hawaiian Education Act granting preferences to Native Hawaiians in the field of

education. Congress made findings of Native Hawaiian socioeconomic and educational disadvantages similar to those which Kamehameha Schools has identified and is likewise seeking to remedy.

Congress has further acknowledged that notwithstanding its prior efforts to fulfill its special trust relationship with Native Hawaiians there is a continuing substantial need for educational assistance and that the parallel trust of Princess Pauahi establishing the Kamehameha Schools is a significant resource in meeting this need.

Section 1981 should be read in harmony with Congress's many findings regarding the needs of Native Hawaiians and with the laws Congress has enacted giving a preference to Native Hawaiians.

In sum, the Court finds that this case presents exceptionally unique circumstances involving a private school, which receives no federal funding, with a remedial race-conscious admissions plan to rectify socioeconomic and educational disadvantages resulting from the influx of western civilization. Congress has determined the United States wrongfully participated in the overthrow of the Hawaiian Monarchy, and also has declared the United States has a special trust relationship with the Native Hawaiians. Congress itself has made extensive legislative findings identifying these disadvantages in laws enacted seeking to remedy them, and has further recognized that Kamehameha Schools' admissions policy and educational program are a means of attaining such remedial goals. The Court finds there is a legitimate justification for Kamehameha Schools' affirmative action plan consisting of its admissions policy and education program, which serves a legitimate remedial purpose, and that the plan reasonably relates to this purpose. The Court makes this finding independent of whether or not the United States wrongfully participated in the overthrow of the Hawaiian Monarchy as determined by Congress.

The Court accordingly denies Plaintiff's motion for partial summary judgment, and grants Defendants' motion for summary judgment.

## BACKGROUND

Before this Court is the limited issue of whether Kamehameha Schools' admissions policy constitutes a valid race-conscious remedial affirmative action program. The matter comes on minor Plaintiff John Doe's Motion for Partial Summary Judgment with Respect to Declaratory and Injunctive Relief ("Plaintiff's Motion"), filed on September 12, 2003 by his mother and next friend Jane Doe. Also before the Court is Defendants' Kamehameha Schools and Trustees Constance Lau, Nainoa Thompson, Dianne J. Plotts, Robert K.U. Kihune, and J. Douglas Ing ("Defendants" or "Kamehameha Schools") Counter–Motion for Summary Judgment and Opposition to Plaintiff's Motion ("Defendants' Motion") filed on September 29, 2003.

### I. Factual Background.

■ The material facts are undisputed.[3] Nevertheless, the matter before this Court, namely the Kamehameha Schools admissions policy granting a preference to Native Hawaiians, does not exist in a vacu-

---

3. Plaintiff does not object to the facts presented by Defendants but rather questions the relevance of Defendants' submissions to the matter before the Court. (Plaintiff's Reply Memorandum of Law in Support of Motion for Summary Judgment with Respect to Declaratory and Injunctive Relief and Opposi-

tion to Defendants' Motion filed on Oct. 20, 2003 ("Plaintiff's Reply") at 1 & n. 1.) Because Plaintiff does not controvert the material facts submitted by Defendants, the Court must therefore deem these facts admitted by Plaintiff. Local R. 56.1(g) (2003) (Admission of Material Facts).

um, but rather comes intertwined with a set of exceptionally unique historical circumstances.[4] The Court will therefore summarize the history of the Native Hawaiian people and Kamehameha Schools.[5]

### A. *The Native Hawaiians.*

The islands of Hawaii comprise a geographically isolated archipelago formed by volcanic activity located in the Pacific Ocean. Historians believe that the aboriginal people of the islands, the Native Hawaiians, settled in Hawaii sometime between 0–750 A.D. *See* (Declaration of R. Kawika Makanani ("Makanani Decl.") ¶ 12 ), *in* (Defendants' Concise Statement of Material Facts filed on Sept. 29, 2003 ("Defendants' CSMF")); *Rice v. Cayetano*, 528 U.S. 495, 500, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000) (citing Lawrence H. Fuchs, Hawaii Pono: An Ethnic and Political History 4 (1961); 1 Ralph S. Kuykendall, The Hawaiian Kingdom 3 (1938); Gavan Daws, Shoal of Time: A History of the Hawaiian Islands xii-xiii (1968)). During their centuries of isolation before western contact, the Native Hawaiians established their own highly structured and successful civilization, which operated under a communal land tenure system and was governed by a system of religious law. (Makanani Decl. ¶¶ 12–16.) *But see Rice*, 528 U.S. at 501, 120 S.Ct. 1044 (describing the Native Hawaiian land system as "feudal" (citing *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 232, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984); *Kaiser Aetna v. United States*, 444 U.S. 164, 166, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979))). They were "a people who were deeply spiritual, intellectual, diligent, highly skilled, pragmatic, loyal to their social system, and who made time to seek the pleasures of life." (Makanani Decl. ¶ 17). At the time of Captain James Cook's "discovery" of the islands in 1778—the first Western contact—estimates and scientific models place the aboriginal population of the Hawaiians at between 300,000 and 800,000. *Id.* ¶ 12 (citing Robert C. Schmitt, Demographic Statistics of Hawaii: 1778–1965 22, 40 (1965); David E. Stannard, Before the Horror: The Population of Hawai'i on the Eve of Western Contact 79 (1989)). *But see Rice*, 528 U.S. at 500,

---

4. As Justice O'Connor admonished in *Grutter v. Bollinger*, 539 U.S. 306, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003), *"context matters,"* even "when reviewing race-based governmental action under the Equal Protection Clause." *Id.* at 2338 (emphasis added) (citing *Gomillion v. Lightfoot*, 364 U.S. 339, 343–344, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (stating that "it is imperative that generalizations, based on and qualified by the concrete situations that gave rise to them, must not be applied out of context in disregard of variant controlling facts"); *see also id.* (explaining that *"[n]ot every decision influenced by race is equally objectionable* and strict scrutiny is designed to provide a framework for carefully examining the importance and the sincerity of the reasons advanced by the governmental decisionmaker for the use of race in that particular context" (emphasis added))); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 228, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (stating that the fundamental purpose for strict scrutiny is to "take 'relevant differences' into account"), *quoted in Grutter*, 539 U.S. at ——, 123 S.Ct. at 2338. As discussed *infra*, the appropriate standard in this case is not strict scrutiny, but rather one based on the Title VII/§ 1981 private employment affirmative action model, a much less rigorous standard. Nevertheless, the Supreme Court's emphasis on the important role context plays in strict scrutiny review serves to accentuate the importance of context for less stringent forms of review.

5. As noted by the Ninth Circuit in its decision in *Rice v. Cayetano*, 146 F.3d 1075 (9th Cir. 1998):

We realize that the historical facts are not without controversy or complexity. We can't begin to set them all out, nor can we even be sure that every fact we recite is not misleading without further explanation.... [O]ur intention is simply to recite enough history to give context to the dispute that we do have to decide.

*Id.* at 1077 n. 4.

120 S.Ct. 1044 (stating that "though population estimates vary, some modern historians conclude that the population in 1778 was about 200,000–300,000" (citing Fuchs, *supra*, at 4; Robert C. Schmitt, Historical Statistics of Hawaii 7 (1977))).

The Native Hawaiians were brought under a unified monarchial government in 1810 by Kamehameha I, the first King of Hawaii. (Makanani Decl. ¶ 26.) The United States recognized the Kingdom of Hawaii as an independent sovereign nation from 1826 until its abrupt demise and replacement by a "Provisional Government" in 1893. *Id.* This Provisional Government subsequently declared itself the "Republic of Hawaii," and sought annexation to the United States, which occurred in 1898 through the Newlands Joint Resolution. *Id.*

**B. The end of the Hawaiian Monarchy.**

Historians are divided and disagree over the events surrounding the demise of the Hawaiian Monarchy in 1893; including the extent to which Native Hawaiians participated on either side and whether the United States Minister John L. Stevens and United States Marines aided the insurrection. Conflicting reports on these events were filed shortly after they occurred. The first report was by former Congressman James Blount who had been appointed by President Cleveland to investigate the matter and who concluded that United States diplomatic and military representatives had wrongfully assisted in an overthrow. James Blount, Report to United States Congress: Hawaiian Islands, Exec. Doc. No. 47, 53d Cong. (1893) [hereinafter "Blount Report"].[6] A second report was filed by Senator John Morgan, Chairman of the Senate Committee on Foreign Relations, who concluded that there was no wrongdoing on the part of any representatives of the United States. *See* John T. Morgan, S. Rep. 227, 53 Cong. (1894). This Court will not address the merits of these differing views of Hawaiian history. What is important is Congress's understanding of these events and how Congress has acted based on its understanding.[7]

6. The Supreme Court referenced the Blount Report during its recitation of Hawaii history in *Rice v. Cayetano*. *See* 528 U.S. at 504–505, 120 S.Ct. 1044 (citing Message of the President to the Senate and House of Representatives, *reprinted in* H.R.Rep. No. 243, 53d Cong., at 3–15 (1893)).

7. The Supreme Court has determined that Congress has the "competency to make such findings of past discrimination as are sufficient to justify a race-conscious remedy." *Valentine v. Smith*, 654 F.2d 503, 508 (8th Cir.1981) (citing *Fullilove v. Klutznick*, 448 U.S. 448, 478, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (ruling that "Congress had abundant historical basis from which it could conclude ... that prospective elimination of these barriers to minority firm access to public contracting opportunities ... was appropriate to ensure ... equal protection of the laws")); *see also Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 303 n. 41, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (stating that "[w]e have previously recognized the special competence of Congress to make findings with respect to the effects of identified past discrimination and in its discretionary authority to take appropriate remedial measures").

Furthermore, in *Rice*, the Supreme Court defined its role with respect to analyzing Congress's various legislative enactments concerning Native Hawaiians:

When Congress and the State of Hawaii enacted the laws we are about to discuss and review, they made their own assessments of the events which intertwined Hawaii's history with the history of America itself .... Historians and other scholars who write of Hawaii will have a different purpose and more latitude than we .... Our more limited role, in the posture of this particular case, is to recount events as understood by the lawmakers, thus insuring that we accord proper appreciation to their purposes in adopting the policies and laws at issue.

528 U.S. at 499, 120 S.Ct. 1044.

Congress has made repeated findings in numerous legislative enactments that the Hawaiian Monarchy was unlawfully overthrown with the aid of the United States. *E.g.*, 20 U.S.C. § 7512 (Supp. I 2002) (Native Hawaiian Education Act ("NHEA") (Findings)); 42 U.S.C. § 11701 (2000) (Native Hawaiian Health Care Improvements Act ("NHHCIA") (Findings)); S. Joint Res. No. 19, Pub.L. No. 103–150, 107 Stat. 1510 (1993) [hereinafter "Apology Resolution"]. Congress additionally has made legislative findings that the United States has a political relationship with and a special trust obligation to Native Hawaiians as the indigenous people of Hawaii. *E.g.*, 20 U.S.C. § 7512; 42 U.S.C. § 11701.

### C. *The effect of western influence on the Native Hawaiians.*

Shortly after annexation, in 1900, only 37,656 Native Hawaiians remained, a number that dwindled to 22,000 by 1919. (Declaration of Shawn Malia Kanaiaupuni ("Kanaiaupuni Decl.") ¶ 30), *in* (Defendants' CSMF). Because of their centuries of isolation before western contact, the Native Hawaiian population had no exposure and hence no immunity to many infectious diseases. (Makanani Decl. ¶ 19.) Diseases introduced by Cook's party and other western sailors, as well as other foreigners, which included measles, mumps, chicken pox, smallpox, tuberculosis, typhus, and venereal diseases, ravaged the Native Hawaiian population. *Id.* (citing Stannard, *supra,* at 78).

Western systems and values were also imposed on the Native Hawaiians. (Makanani Decl. ¶¶ 96–100). The implementation of a western-style school system focused on general world information and the development of basic math and literacy skills in an effort to westernize Native Hawaiian society. (Makanani Decl. ¶ 34.) It did not account for the Native Hawaiian customary method of learning, nor for the unique Native Hawaiian culture and heritage. (Declaration of Maenette K.P. Benham ("Benham Decl.") ¶ 31–39), *in* (Defendants' CSMF). The use of the Hawaiian language as an instructional medium was banned in the schools from 1896 until 1986. 20 U.S.C. § 7512(19); (Declaration of Nainoa Thompson ("Thompson Decl.") ¶ 5, *in* Defendants' CSMF); (Benham Decl. ¶ 46). The school system furthermore operated essentially as a dual-tracked system, with most Native Hawaiians receiving training suitable only for vocational and low paying jobs. (Benham Decl. ¶¶ 35–36); (Makanani Decl. ¶¶ 35–36). Education thus operated generally to further marginalize Native Hawaiians. (Benham Decl. ¶ 36); (Makanani Decl. ¶ 36).

The net result of these and other forces and changes brought to bear on the Native Hawaiian society has been summarized in the following manner: "By virtually every measure of well being, Native Hawaiians are among the most disadvantaged ethnic groups in the State of Hawai'i." (Kanaiaupuni Decl. ¶ 12); *see also* U.S. Dep't of Justice & U.S. Dep't of the Interior, From Mauka to Makai: The River of Justice Must Flow Freely 1–2 (Oct. 23, 2000) [hereinafter "From Mauka to Makai"] (Attachment "B" to Benham Decl.) ("As a result of the overthrow, laws suppressing Hawaiian culture and language, and displacement from the land, the Native Hawaiian people suffered mortality, disease, economic deprivation, social distress and population decline.... [They] continue to suffer from economic deprivation, low educational attainment, poor health status, substandard housing and social dislocation."), *quoted in* (Benham Decl. ¶ 71). They have among the lowest incomes and highest rates of poverty in Hawaii. (Kanaiaupuni Decl. ¶¶ 12, 50–55.) Native Hawaiian students score the lowest among all major ethnic groups on statewide-standardized tests; the gap between Native Hawaiian students and their peers increas-

es throughout the grade levels. *Id.* ¶¶ 130–37. Nearly 79% of Hawaii public schools with a predominantly Native Hawaiian student body do not satisfy the State's minimal educational standards, as compared to 17.4% of public schools without a predominantly Native Hawaiian student body. *Id.* ¶ 115.

## D. Congressional recognition of the need for reconciliation.

More than 80 years ago, Congress recognized that a special relationship exists between the United States and the Native Hawaiian people, in enacting the Hawaiian Homes Commission Act of 1920, 67 Pub.L. No. 34, ch. 42, 42 Stat. 108 (1921). Congress has continued to recognize a political relationship with and special trust obligation to the Native Hawaiian people since that time, as evidenced most recently by the 2002 NHEA. *See* 20 U.S.C. § 7512(8).

On the 100th Anniversary of the demise of the Kingdom of Hawaii, Congress issued an acknowledgment and apology known as the Apology Resolution whereunder Congress, inter alia, apologized "to Native Hawaiians on behalf of the people of the United States for the overthrow of the Kingdom of Hawaii on January 17, 1893 with the participation of agents and citizens of the United States, and the deprivation of the rights of Native Hawaiians to self determination." Apology Resolution, *supra,* 107 Stat. at 1513. Congress furthermore expressed "its commitment to acknowledging the ramifications of the overthrow of the Kingdom of Hawaii, in order to provide a proper foundation for reconciliation between the United States and the Native Hawaiian people." *Id.*

In the 2002 NHEA, Congress made the following findings:

(1) Native Hawaiians are a distinct and unique indigenous people with a histori-

cal continuity to the original inhabitants of the Hawaiian archipelago, whose society was organized as a nation and internationally recognized as a nation by the United States, Britain, France and Japan, as evidenced by treaties governing friendship, commerce, and navigation.

(2) At the time of the arrival of the first nonindigenous people in Hawaii in 1779, the Native Hawaiian people lived in a highly organized, self sufficient subsistence social system based on a communal land tenure system with a sophisticated language, culture, and religion.

. . . .

(4) From 1826 until 1893, the United States recognized the sovereignty and independence of the Kingdom of Hawaii, which was established in 1810 under Kamehameha I, extended full and complete diplomatic recognition to the Kingdom of Hawaii, and entered into treaties and conventions with the Kingdom of Hawaii to govern friendship, commerce and navigation in 1826, 1842, 1849, 1875, and 1887.

(5) In 1893, the sovereign, independent, internationally recognized, and indigenous government of Hawaii, the Kingdom of Hawaii, was overthrown by a small group of non-Hawaiians, including United States citizens, who were assisted in their efforts by the United States Minister, a United States naval representative, and armed naval forces of the United States. Because of the participation of United States agents and citizens in the overthrow of the Kingdom of Hawaii, in 1993, the United States apologized to Native Hawaiians for the overthrow and the deprivation of the rights of Native Hawaiians to self-determination through Public Law 103–150 (107 Stat. 1510).[8]

. . . .

---

**8.** The Court again notes that it only recounts the 1893 events as understood by Congress.

(12) The United States has recognized and reaffirmed that—

(A) Native Hawaiians have a cultural, historic, and land-based link to the indigenous people who exercised sovereignty over the Hawaiian Islands, and that group has never relinquished its claims to sovereignty or its sovereign lands;

(B) *Congress does not extend services to Native Hawaiians because of their race, but because* of their unique status as the *indigenous people* of a once sovereign nation as to whom the United States has established a *trust relationship;*

. . . .

(D) the *political status* of Native Hawaiians is comparable to that of American Indians and Alaska Natives; and

(E) The aboriginal, indigenous people of the United States have—

(i) a continuing right to autonomy in their internal affairs; and

(ii) an ongoing right of self-determination and self-governance that has never been extinguished.

(13) The *political relationship between the United States and the Native Hawaiian people has been recognized* and reaffirmed by the United States, as evidenced by the inclusion of Native Hawaiians in—

(A) the Native American Programs Act of 1974 (42 U.S.C. §§ 2991 et seq.);

(B) the American Indian Religious Freedom Act (42 U.S.C. § 1996);

(C) the National Museum of the American Indian Act (20 U.S.C. §§ 80q et seq.);

(D) the Native American Graves Protection and Repatriation Act (25 U.S.C. §§ 3001 et seq.);

(E) the National Historic Preservation Act (16 U.S.C. §§ 470 et seq);

(F) the Native American Languages Act (25 U.S.C. §§ 2901 et seq.);

(G) the American Indian, Alaska Native, and Native Hawaiian Culture and Art Development Act (20 U.S.C. §§ 4401 et seq.);

(H) the Workforce Investment Act of 1998 (29 U.S.C. §§ 2801 et seq.); and

(I) the Older Americans Act of 1965 (42 U.S.C. §§ 3001 et seq.).

(14) In 1981, Congress instructed the Office of Education to submit to Congress a comprehensive report on Native Hawaiian education. The report, entitled the "Native Hawaiian Educational Assessment Project," was released in 1983 and documented that Native Hawaiians scored below parity with regard to national norms of standardized achievements tests, were disproportionately represented in many negative social and physical statistics indicative of special educational needs, and had educational needs that were related to their unique cultural situation, such as different learning styles and low self-image.

(15) In recognition of the educational needs of Native Hawaiians, in 1988, Congress enacted title IV of the Augustus F. Hawkins–Robert T. Stafford Elementary and Secondary School Improvement Amendments of 1988 (102 Stat. 130) to authorize and develop supplemental educational programs to address the unique conditions of Native Hawaiians.

(16) In 1993, the Kamehameha Schools Bishop Estate released a 10–year update of findings of the Native Hawaiian Educational Assessment Project, which found that despite the successes of the programs established under title IV of the Augustus F. Hawkins–Robert T. Stafford Elementary and Secondary School Improvements Amendments of 1988, many of the same educational

needs still existed for Native Hawaiians. Subsequent reports by the Kamehameha Schools Bishop Estate and other organizations have generally confirmed those findings. For example—

(A) education risk factors continue to start even before birth from many Native Hawaiian children, including—

(i) late or no prenatal care;

(ii) high rates of births by Native Hawaiian women who are unmarried; and

(iii) high rates of births to teenage parents;

(B) Native Hawaiian students continue to begin their school experience lagging behind other students in terms of readiness factors such as vocabulary test scores;

(C) Native Hawaiian students continue to score below national norms on standardized education achievement tests at all grade levels;

(D) both public and private schools continue to show a pattern of lower percentages of Native Hawaiian students in the uppermost achievement levels and in gifted and talented programs;

(E) Native Hawaiian students continue to be overrepresented among students qualifying for special education programs provided to students with learning disabilities, mild mental retardation, emotional impairment, and other such disabilities;

(F) Native Hawaiians continue to be underrepresented in institutions of higher education and among adults who have completed four or more years of college;

(G) Native Hawaiians continue to be disproportionately represented in many negative social and physical statistics indicative of special educational needs, as demonstrated by the fact that—

(i) Native Hawaiian students are more likely to be retained in grade level and to be excessively absent in secondary school;

(ii) Native Hawaiian students have the highest rates of drug and alcohol use in the State of Hawaii; and

(iii) Native Hawaiian children continue to be disproportionately victimized by child abuse and neglect; and

(H) Native Hawaiians now comprise over 23 percent of the students served by the State of Hawaii Department of Education, and there are and will continue to be geographically rural, isolated areas with a high Native Hawaiian population density.

(17) In the 1998 National Assessment of Educational Progress, Hawaiian fourth-graders ranked 39th among groups of students from 39 States in reading. Given that Hawaiian students rank among the lowest groups of students nationally in reading, and that Native Hawaiian students rank the lowest among Hawaiian students in reading, it is imperative that greater focus be placed on beginning reading and early education and literacy in Hawaii.

(18) The findings described in paragraphs (16) and (17) are inconsistent with the high rates of literacy and integration of traditional culture and Western education historically achieved by Native Hawaiians through a Hawaiian language-based public school system established in 1840 by Kamehameha III.

(19) Following the overthrow of the Kingdom of Hawaii in 1893, Hawaiian medium schools were banned. After annexation, throughout the territorial and statehood period of Hawaii, and until 1986, use of the Hawaiian language as an instructional medium in education in public schools was declared unlawful.

The declaration caused incalculable harm to a culture that placed a very high value on the power of language, as exemplified in the traditional saying: "I ka ʻōlelo nō ke ola; I ka ʻōlelo nō ka make. In the language rests life; In the language rests death.".

(20) Despite the consequences of over 100 years of nonindigenous influence, the Native Hawaiian people are determined to preserve, develop, and transmit to future generations their ancestral territory and their cultural identity in accordance with their own spiritual and traditional beliefs, customs, practices, language, and social institutions.

. . . .

20 U.S.C. § 7512 (emphasis added);[9] *accord* 42 U.S.C. § 11701; Apology Resolution, *supra.*[10]

### E. *Kamehameha Schools and its admissions policy.*

As described by the Ninth Circuit, "the Bishop Trust is a charitable testamentary trust established by the last direct descendant of King Kamehameha I, Princess Bernice Pauahi Bishop, who left her property in trust for a school dedicated to the education and upbringing of Native Hawaiians."[11] *Burgert v. Lokelani Bernice Pauahi Bishop Trust,* 200 F.3d 661, 663 (9th Cir.2000). The Court notes, from a historical perspective, that the Kamehameha Schools was established before Hawaii became a part of the United States, and that the admissions policy provides a preference for Native Hawaiians, the indigenous people of Hawaii.

Pauahi's own experience in receiving a Christian education from missionaries at the Chiefs' Children's School, her love for learning, and her husband Charles R. Bishop's services as president of the Board of Education of the Kingdom of Hawaii all contributed to her belief in the saving value of education for her people. (Makanani Decl. ¶ 106.) Her marriage was childless and thus her Hawaiian love and desire for children was fulfilled through embracing the children of her people as her own. *Id.* ¶ 102. Her bequest of her vast estate to the foundation of Kamehameha Schools further reflected the Aliʻi[12] tradition of providing and caring for others. *Id.* ¶ 108.

In her Will, Pauahi established a trust for the Kamehameha Schools, directing, inter alia, that the Trustees "devote a portion of each years income to the support and education of orphans, and others in indigent circumstances, giving the preference to Hawaiians of pure or part aboriginal blood," and also giving "unto my said Trustees full power to make all such rules and regulations as they may deem necessary for the government of said schools and to regulate the admissions of pupils." (Will of Bernice Pauahi Bishop [hereinafter "Pauahi Will"] (Attachment "C" to Makanani Decl.).) Thus it is clear that Pauahi left to her Trustees the discretion "to regulate the admission of pupils." *Id.*

Charles R. Bishop, who was the Chairman of the original Board of Trustees and who was Pauahi's husband of some 30 years, made known that it was her intent to give a preference to students of Native Hawaiian ancestry. (Makanani Decl.

---

9. Congress re-enacted the NHEA, and made these findings, after the Supreme Court decided *Rice.*

10. The Court reiterates Congress's competency to make findings of past discrimination that are sufficient to justify a race-conscious remedy. *See supra* note 7.

11. Princess Bernice Pauahi Bishop had been asked to succeed King Kamehameha V as the next sovereign of the Kingdom of Hawaii. (Makanani Decl. ¶ 104.)

12. Native Hawaiian Chiefs and Chiefesses. (Makanani Decl. ¶ 13); (Benham Decl. ¶ 19).

¶¶ 107–13.) Mr. Bishop explained his wife's intentions in a speech on the Schools first Founder's Day, in December 1888:

> Bernice Pauahi Bishop, by founding the Kamehameha Schools, intended to establish institutions which would be of lasting benefit to her country .... The founder of these schools was a true Hawaiian. She knew the advantages of education and well directed industry. Industrious and skillful herself, she respected those qualities in others. Her heart was heavy when she saw the rapid diminution of the Hawaiian people going on decade after decade and felt that it was largely the result of their ignorance and carelessness. She knew that these fair islands, which only a little more than a century ago held a population of her own race estimated at 300,000 or more, would not be left without people; that whether the Hawaiians increased or not, men from the East and from the West would come in to occupy them; skillful and industrious, self-asserting men, looking mainly to their own interest. The hope that there would come a turning point, when, through enlightenment, the adoption of regular habits and Christian ways of living, the natives would not only hold their own in numbers, but would increase again like the people of other races at times grew faint and almost died out .... She foresaw that, in a few years the natives would cease to be much if any in the majority, and that they would have to compete with other nationalities .... And so, *in order that her own people might have the opportunity for fitting themselves for such competition,* and be able to hold their own in a manly and friendly way, without asking any favors which they were not likely to receive, *these schools were provided for, in which Hawaiians have the preference,* and in which she hoped they would value and take the advantages of as fully as possible.

*Id.* ¶ 109 (emphasis added) (quoting Charles R. Bishop, Founders Day Address (Dec. 19, 1888), *in* Charles R. Bishop, *The Purpose of the Schools,* Handicraft, Jan. 1889, at 1, 3). The Court finds that the emphasized statement represents the core of Kamehameha Schools' mission.

In a subsequent letter of February 11, 1897, Mr. Bishop further explained that "there is nothing in the Will of Mrs. Bishop excluding white boys or girls from the schools, but it is understood by the Trustees that only those having Native blood are to be admitted *at present.*" *Id.* ¶ 110 (emphasis added) (quoting George Hu'eu Sanford Kanahele, Pauahi, The Kamehameha Legacy 177 (1986)). In a letter dated February 20, 1901, Mr. Bishop stated that

> the preference to Hawaiians of pure or part aboriginal blood applies only to education of orphans and others in indigent circumstances; but it was intended and expected that Hawaiians having aboriginal blood would have a preference .... Education of the Natives was the first, *but not the exclusive and perpetual purpose of the Founder of the School.*

(Letter from Charles R. Bishop to Samuel L. Damon dated Feb. 20, 1901 [hereinafter "Bishop Feb. 20, 1901 Letter"] (Attachment "E" to Makanani Decl.) (emphasis added)), *quoted in* (Makanani Decl. ¶ 111). He continued by stating that "those of other races were not barred or excluded" and concluded that "it was wise to prepare for and admit Natives only and *I do not think that the time has yet come* when it is better to depart from that rule." *Id.* (emphasis added).

Thus it is evident that the intent of Princess Pauahi, as explained through her husband Charles Bishop, was that preference be given to Native Hawaiians for admittance to the Kamehameha Schools in order that through proper education they might be competitive with newcomers in

maintaining their socioeconomic status, culture, and participate in the governance of their communities. It is further evident that this preference was not perpetual nor an absolute bar to admittance of other races to the Kamehameha Schools, but only for so long as it took the schools to fulfill its responsibility in attaining the goal of educating Native Hawaiians to overcome the manifest imbalance resulting from socioeconomic and educational disadvantages, and non-Native Hawaiians would be admitted when that goal was attained or at such earlier date when the schools has the capacity to also admit non-Native Hawaiians. In sum, it was the vision of Princess Pauahi to save her people through education. (Declaration of J. Douglas Keauhou Ing ("Ing Decl.") ¶¶ 13, 77), *in* (Defendants' CSMF).

At present, Kamehameha Schools aims to redress the under-representation of Native Hawaiians in contemporary society, thereby remedying the continuing effects of marginalization and the impact of western civilization. (Ing Decl. ¶¶ 36–41, 43, 59–61); (Benham Decl. ¶¶ 40–46, 54–59); (Kanaiaupuni Decl. ¶¶ 12–20). Kamehameha Schools furthermore seeks to preserve and perpetuate Native Hawaiian culture and identity. *See id.* ¶¶ 44, 71; (Kanaiaupuni Decl. ¶¶ 232–40.) In its campus-based programs, which represent its "Leadership Model," Kamehameha Schools "seek[s] to restore self-identity, integrate Native Hawaiian culture, heritage, language, and traditions into the educational process, and provide a first rate educational experience for Native Hawaiians." (Ing Decl. ¶ 60.) Kamehameha Schools seeks to accomplish this by, inter alia:

Increas[ing] the achievement test scores of Native Hawaiian students;

Increas[ing] the number of Native Hawaiians receiving college and advanced degrees;

Improv[ing] Native Hawaiian representation in professional, academic and managerial positions;

Provid[ing] leaders committed to improving the lives of all Native Hawaiians, including "good and industrious" men and women who will return to the Native Hawaiian community to lead solid and productive lives and provide a stabilizing influence in the Native Hawaiian community as a whole; and

Restor[ing] the importance and value of Native Hawaiian culture, language and identity.

*Id.*

Kamehameha Schools has achieved measurable success with its education program. During the ten-year period between 1991 and 2000, Kamehameha Schools seniors "consistently outperformed both national norms and state averages on the SAT I verbal and math tests." (Kanaiaupuni Decl. ¶ 170.) Average daily attendance rates at Kamehameha Schools are higher than the attendance rates of the Hawaii Department of Education system. *Id.* ¶ 172. Ninety-eight percent of the Kamehameha Schools Class of 2002 indicated plans to enroll in some form of postsecondary school; eighty-four percent planned to attend a four year college. *Id.* ¶ 176. Graduates of Kamehameha Schools have distinguished themselves as leaders and contributors to the State of Hawaii and the Native Hawaiian community. (Ing Decl. ¶¶ 66–68.)

Kamehameha Schools' "policy on admissions is to give preference to children of Hawaiian ancestry to the extent permitted by law." (Declaration of Teresa Makuakane–Drechsel ("Makuakane–Drechsel Decl.") ¶ 3), *in* (Defendants' CSMF). This preference applies to any school-aged child descended from the aboriginal people who exercised sovereignty in the Hawaiian Islands prior to 1778. *Id.* Kamehameha

Schools does not, however, require any minimum degree of such ancestry. *Id.*

Kamehameha Schools has a limited number of spaces available in relation to the approximately 70,000 Native Hawaiian school-aged children in the State of Hawaii. *Id.* ¶ 6. At present, Kamehameha Schools operates three campuses: one on the Island of Maui, another on the Island of Hawaii, and the largest located in Kapalama, on the Island of Oahu. (Ing Decl. ¶ 14.) The Schools currently has a total enrollment of 4,856 students, and enrolls approximately 738 new students state-wide each year. (Makuakane–Drechsel Decl. ¶ 6.) For the 450 spaces available at Kamehameha Schools' Kapalama campus for the 2002–2003 academic year, there were 4,518 applicants. *Id.* However, Kamehameha Schools admitted a non-Native Hawaiian student at its Maui campus for the 2002–2003 academic year, because space remained after all qualified Native Hawaiian applicants were admitted. *Id.* ¶ 7.

The Kamehameha Schools' student body represents virtually every race, albeit with each student having some Native Hawaiian blood. *Id.* ¶ 8. Over 96% of the Kamehameha Schools student body claims three or more ethnic identities, and over 60 identifiable racial or ethnic groups are represented at Kamehameha Schools. (Kanaiaupuni Decl. ¶ 161); (Makuakane–Drechsel Decl. ¶ 8).

## II. *Factual Background of the Complaint.*

Plaintiff John Doe is a non-elementary student who applied to Kamehameha Schools for both the 2002–2003 and 2003–2004 school years. (Declaration of John Doe ("John Doe Decl.") ¶¶ 2–3), *in* (Plaintiff's Concise Statement of Material Facts filed on Sept. 12, 2003 ("Plaintiff's CSMF")); (Declaration of Jane Doe ("Jane Doe Decl.") ¶¶ 2–3, 6–7), *in* (Plaintiff's CSMF); (2002–2003 Kamehameha Schools

Application ("2002–2003 Application") (Exhibit "E" to Jane Doe Decl.)); (2003–2004 Kamehameha Schools Application ("2003–2004 Application") (Exhibit "G" to Jane Doe Decl.)). When completing each of his two applications, Plaintiff disclosed that he was not of Hawaiian Ancestry in the "Ethnic Ancestry Survey" included as part of the Kamehameha Schools' admissions packets. (Jane Doe Decl. ¶¶ 3, 7); (Ethnic Ancestry Survey 2002–2003), *in* 2002–2003 Application; (Ethnic Ancestry Survey 2003–2004), *in* 2003–2004 Application; *see* (Amended Answer filed on Sept. 24, 2003 ("Amended Answer") ¶ 12). Although the Kamehameha Schools' Admissions Office described Plaintiff as a "competitive applicant," and in fact placed him on the "waiting list" each year, both of his applications were ultimately denied. (Jane Doe Decl. ¶¶ 4–5, 8–9); (Letter from Kamehameha Schools Admissions Office to Jane Doe dated March 25, 2002 (Exhibit "F" to Jane Doe Decl.)); (Letter from Kamehameha Schools Admissions Office to Jane Doe dated March 14, 2003 (Exhibit "H" to Jane Doe Decl.)).

Plaintiff asserts that he was denied admission because of his acknowledged lack of Hawaiian ancestry. (Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment with Respect to Declaratory and Injunctive Relief filed on Sept. 12, 2003 ("Plaintiff's Memo.") at 2.) Defendants admit that "were Plaintiff of 'Hawaiian ancestry,' Plaintiff would likely have been admitted to a Kamehameha [Schools] campus for the 2003–2004 school year." (Amended Answer ¶ 16.)

Plaintiff states that he remains interested in attending a Kamehameha Schools campus, and will have applied for admission to Kamehameha Schools for the 2004–2005 school year before the published deadline of October 15, 2003. (John Doe Decl. ¶ 4); (Jane Doe Decl. ¶ 10).

### III. *Procedural Background.*

Plaintiff John Doe, a minor, by his mother and next friend Jane Doe, filed a complaint with this Court on June 25, 2003. In his complaint, Plaintiff alleges that the admissions policy of Kamehameha Schools, which includes a preference for children of Hawaiian ancestry, violates 42 United States Code ("U.S.C.") § 1981. Plaintiff seeks, inter alia, a declaratory judgment that the challenged policy is illegal and unenforceable; a permanent injunction against any further implementation of the challenged policy or any other admissions policy at Kamehameha Schools that grants a preference on the basis of "Hawaiian ancestry"; and a permanent injunction admitting Plaintiff to a Kamehameha Schools campus. (Complaint ¶ 1, at 2.) Defendants filed their Answer on July 17, 2003 and subsequently filed an Amended Answer on September 24, 2003.

Plaintiff filed his pending Motion for Partial Summary Judgment with Respect to Declaratory and Injunctive Relief on September 12, 2003. Defendants filed their Counter–Motion for Summary Judgment and Opposition to Plaintiff's Motion on September 29, 2003. Plaintiff filed his Reply and Opposition on October 20, 2003, and Defendants filed their Reply on November 6, 2003.

Also on November 6, 2003, the Court received two petitions for leave to file an amicus curiae brief, the first filed by the State of Hawaii, and the second filed jointly by the Kamehameha Schools Association of Teachers & Parents, Kamehameha Schools Faculty Association, Na Kumu o Kamehameha, Kamehameha Schools Alumni Association–Board of Presidents, Kamehameha Schools Alumni Association– Oahu Region, and Na Pua a Ke Ali'i Pauahi Inc. ("Joint Petitioners"). The Court granted the State of Hawaii's petition on November 6, 2003; the State filed its amicus brief that same day. The Court granted the Joint Petitioners leave to file on November 7, 2003; they filed their amicus brief on November 10, 2003. Plaintiff filed his responses to both amicus briefs on November 12, 2003.

The Court heard argument on Plaintiff's and Defendants' motions on November 17, 2003. Eric Grant appeared on behalf of Plaintiff; Kathleen M. Sullivan appeared on behalf of Defendants.

### STANDARD

■ The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is therefore appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."[13] Fed. R.Civ.P. 56(c).

"A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case. A genuine issue of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[14] *Thrifty Oil Co. v. Bank of Am. Nat'l Trust*

---

**13.** Affidavits made on personal knowledge and setting forth facts as would be admissible at trial are evidence that a court may consider when determining whether a material issue of fact exists. Fed.R.Civ.P. 56(e). Legal memoranda and oral argument are not evidence and do not create issues of fact. *See British*

*Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir.1978).

**14.** Disputes as to immaterial issues of fact do "not preclude summary judgment." *Lynn v. Sheet Metal Workers' Int'l Ass'n,* 804 F.2d 1472, 1478 (9th Cir.1986).

& Sav. Ass'n, 310 F.3d 1188, 1194 (9th Cir.2002) (quoting *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1523 (9th Cir.1994)) (internal citations omitted). Conversely, where the evidence "could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

The moving party has the burden of persuading the Court as to the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The moving party may do so with affirmative evidence or by "'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. All evidence and reasonable inferences drawn therefrom are considered in the light most favorable to the nonmoving party. *See, e.g., T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir.1987). So, too, the Court's role is not to make credibility assessments. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Accordingly, if "reasonable minds could differ as to the import of the evi-

dence," summary judgment will be denied. *Id.* at 250–51, 106 S.Ct. 2505.

Once the moving party satisfies its burden, however, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *See Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Matsushita Elec.*, 475 U.S. at 586, 106 S.Ct. 1348; *Cal. Arch. Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987). Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir.2002); *see also T.W. Elec. Serv.*, 809 F.2d at 630. The nonmoving party must instead set forth "significant probative evidence" in support. *T.W. Elec. Serv.*, 809 F.2d at 630. Summary judgment will thus be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial.[15] *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

### DISCUSSION

Plaintiff argues that the admissions policy of Kamehameha Schools unlawfully discriminates on the basis of race, in violation of 42 U.S.C. § 1981.[16] In its present form, § 1981 provides, in relevant part:

---

**15.** When the moving party also has the burden of proof in an element of a claim, it has the "burden of establishing a prima facie case on the motion for summary judgment." *UA Local 343 of the United Ass'n of Journeymen v. Nor–Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir.1994). Upon showing a prima facie case, the burden of production shifts and it becomes "incumbent on [the nonmoving party] to 'set forth specific facts showing that there is a genuine issue for trial,' by evidence cognizable under that rule." *Id.* (quoting Fed.R.Civ.P. 56(e)); Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice & Procedure § 2727 (3d ed.1998). The ultimate burden of persuasion as to the non-existence of any genuine issues of materi-

al fact remains on the moving party. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir.2000); *accord Dye v. United States*, 121 F.3d 1399, 1409 (10th Cir. 1997).

**16.** Plaintiff bases his complaint entirely on § 1981. He does not allege violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. (2000 & Supp. I 2002), nor does he allege any Equal Protection violations. Plaintiff does not argue that Title VI or Equal Protection apply in this matter. Moreover, Defendants assert that Kamehameha Schools does not receive any federal funding. (Reply Memorandum in Support of Defendants' Motion for Summary Judgment filed

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts,[17] to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens ....

42 U.S.C. § 1981(a) (2000) (Statement of Equal Rights). As discussed by a multitude of courts, this text first originated as part of the Civil Rights Act of 1866, 14 Stat. 27, later reenacted as part of the Civil Rights Act of 1870, 16 Stat. 96, and then codified in 1874 as Revised Statutes § 1977. *See, e.g., Runyon v. McCrary,* 427 U.S. 160, 168 n. 8, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 422 n. 28, 441 n. 78, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).

When interpreting § 1981, the Supreme Court has determined that because both the Thirteenth and Fourteenth Amendments provided bases for its enactment, § 1981 applies to both private and governmental entities. *E.g., Patterson v. McLean Credit Union,* 491 U.S. 164, 171–75, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); *Runyon,* 427 U.S. at 168–171, 96 S.Ct. 2586. The Supreme Court has furthermore looked beyond the plain language of § 1981 and held that Congress intended to give the statute a broad reach, finding that § 1981 applies not only to racial discrimination against minorities, but also to any purposeful discrimination based solely on race, ancestry, or ethnic characteristics. *E.g., Rice,* 528 U.S. at 515, 120 S.Ct. 1044 (stating that " 'racial discrimination' is that which singles out 'identifiable classes of persons ... solely because of their ancestry or ethnic characteristics' " when determining the Fifteenth Amendment prohibited the State of Hawaii from holding a statewide election in which only individuals of Native Hawaiian ancestry were eligible to vote (quoting *Saint Francis Coll. v. Al-Khazraji,* 481 U.S. 604, 613, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987))); *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 295, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) (stating that Congress intended for § 1981 "to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race," when determining that § 1981 applied to instances of racial discrimination against white persons). Moreover, the Supreme Court has extended the scope of § 1981 to encompass contracts such as those for educational services, thereby allowing the statute to reach private school admissions policies. *Runyon,* 427 U.S. at 172, 96 S.Ct. 2586, *cited in Gratz v. Bollinger,* 539 U.S. 244, 123 S.Ct. 2411, 2430 n. 23, 156 L.Ed.2d 257 (2003).

## I. *The Limited Issue Before the Court*

In the matter before this Court, Defendants do not challenge whether Plaintiff establishes a prima facie case of purposeful racial discrimination in violation of § 1981,[18] but actually acknowledge that Kamehameha Schools' admissions policy

---

on Nov. 6, 2003 ("Defendants' Reply") at 9 n. 2.) Nothing in the record contradicts Defendants' assertion.

Further, Plaintiff also does not challenge any congressional enactment nor does he challenge any constitutional provision or statute of the State of Hawaii.

**17.** Section 1981 clarifies the term "make and enforce contracts" in the following manner:

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981(b) (2000).

**18.** Defendants also do not contest Plaintiff's standing to bring this action. (Amended Answer at 3–4); *see* (Plaintiff's Reply at 3).

Defendants argue, however, that the First Amendment provides Kamehameha Schools' the "right to associate with others in pursuit

incorporates a preference for students of Native Hawaiian ancestry. (Defendants' Memo. at 53, 56); (Amended Answer ¶ 2); *see* (Plaintiff's Reply at 3–4). Defendants assert that the admissions policy is race-conscious and serves a legitimate remedial purpose, and thereby argue that they rebut the inference of a § 1981 violation raised by the establishment of a prima facie case. (Defendants' Memo. at 58–60); *see, e.g., Brown v. Sierra Nevada Mem'l Miners Hosp.*, 849 F.2d 1186, 1193 (9th Cir.1988) (affirming that proof of an accompanying legitimate purpose could overcome the inference of purposeful discrimination raised by the establishment of a prima facie case under § 1981); *Pilditch v.*

*Bd. of Educ.*, 3 F.3d 1113, 1116 (7th Cir. 1993) (explaining that "[t]he McDonnell Douglas framework 'simply drops out of the picture' after the employer has offered a legitimate non-discriminatory reason for the [action or decision], and the plaintiff retains the ultimate burden of persuading the trier of fact that he was discriminated against because of some illegitimate concern, in this case race" (citations omitted) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)) (citing *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983))); *see also Setser v. Novack*, 657 F.2d 962, 968 (8th Cir.1981)

---

of a wide variety of political, social, economic, *educational*, religious, *and cultural ends.*" (Defendants' Memorandum in Support of Defendants' Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment with Respect to Declaratory and Injunctive Relief filed on Sept. 29, 2003 ("Defendants' Memo.") at 72 (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984)) (citing *Legal Aid Soc'y v. Legal Servs. Corp.*, 961 F.Supp. 1402, 1409 (D.Haw.1997))); (Defendants' Reply at 3–4 (quoting *Roberts*, 468 U.S. at 622, 104 S.Ct. 3244) (citing *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000))). However, in *Roberts*, the Supreme Court explained that

> [t]he right to associate for expressive purposes is not, however, absolute. Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.

468 U.S. at 623, 104 S.Ct. 3244. The *Roberts* Court accordingly determined that the Minnesota Human Rights Act, M.S.A. §§ 363.01 et seq. (1982), served a compelling state interest in "eradicating discrimination against [the State of Minnesota's] female citizens, [which] justifie[d] the impact that application of the statute to the Jaycees may have on the male members' associational freedoms." *Id.* The application of a statute, such as § 1981, to eradicate "invidious" discrimination does not violate the First Amendment. *See Runyon*,

427 U.S. at 176, 96 S.Ct. 2586 (stating that " 'the Constitution ... places no value on discrimination,' and while '[i]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment ... it has never been accorded affirmative constitutional protections' " (alteration in original) (citations omitted) (quoting *Norwood v. Harrison*, 413 U.S. 455, 469, 470, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973))).

In this case, however, consideration of the First Amendment appears to be irrelevant. If Kamehameha Schools' admissions policy violates § 1981, it would be no different than the admissions policies in *Runyon*, and therefore accorded no protection by the First Amendment. Conversely, if the policy does not violate § 1981, because it is a legitimate race-conscious remedial policy, then First Amendment protection is redundant. Thus, First Amendment considerations do not affect this Court's decision.

Defendants further argue in their Reply that the relationship between Kamehameha Schools and its Native Hawaiian students is of a personal nature, thereby challenging the applicability of § 1981. (Defendants' Reply at 2–3.) The Court declines to consider this line of argument, because Defendants did not assert it in their Memorandum supporting their motion for summary judgment. (Defendants' Memo. at 57 n. 5), *see* Local R. 7.4 (2003) ("Any arguments raised for the first time in the reply shall be disregarded.").

(en banc) (holding that a race-conscious affirmative action program rebuts the inference raised by a prima facie § 1981 case); *Stock v. Universal Foods Corp.*, 817 F.Supp. 1300, 1306 (D.Md.1993).

Plaintiff agrees with Defendants that the "sole remaining issue is whether [Kamehameha Schools] has a 'legitimate justification'" for its admissions policy. (Plaintiff's Reply at 4 (citing Defendants' Memo. at 53).) The parties also do not dispute that the issue "is strictly a question of law for decision by the Court." (Defendants' Memo. at 53 (citing *Cerrato v. San Francisco Cmty. Coll. Dist.*, 26 F.3d 968, 974 (9th Cir.1994)), *quoted in* (Plaintiff's Reply at 4)).

■ Plaintiff argues, however, that "[t]he governing standard for § 1981 claims, including such claims against nongovernmental entities like [Kamehameha Schools], is the same standard that governs claims under the Equal Protection Clause of the Fourteenth Amendment," because the "'prohibition against [racial] discrimination in § 1981 is co-extensive with the Equal Protection Clause.'" *Id.* at 4–6 (alteration in original) (quoting *Grutter*, 539 U.S. at ——, 123 S.Ct. at 2347).

This argument ignores the dual nature of § 1981 and the contexts in which it is applied.

■ The dual applicability of § 1981 results in two basic scenarios for analysis, which can be broadly generalized as those that involve governmental entities and those that involve private entities.[19] In cases that allege a violation of § 1981 by governmental entities or institutions that accept federal funds and are thereby subject to Title VI,[20] courts have logically applied § 1981 on its Fourteenth Amendment basis, i.e. to enforce Equal Protection. *E.g.*, *Gratz*, 539 U.S. at —— & n. 23, 123 S.Ct. at 2431 & n. 23 (holding that in the context of a state-operated school which also receives federal funds and thereby subject to Title VI, purposeful discrimination that violates the Equal Protection Clause also violates Title VI and § 1981 (citing *Alexander v. Sandoval*, 532 U.S. 275, 281, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001); *United States v. Fordice*, 505 U.S. 717, 732 n. 7, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992); *Alexander v. Choate*, 469 U.S. 287, 293, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985); *Gen. Blg. Contractors*,[21] 458 U.S. at 389–90, 102 S.Ct. 3141));

**19.** Regardless of which scenario in which it is applied, § 1981 prohibits only purposeful or intentional discrimination. *E.g.*, *Al–Khazraji*, 481 U.S. at 613, 107 S.Ct. 2022, *cited in Pavon v. Swift Transp. Co.*, 192 F.3d 902, 908 (9th Cir.1999); *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 382–91, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (determining that § 1981 can only be violated by purposeful discrimination), *cited in Gratz*, 539 U.S. at —— n. 23, 123 S.Ct. at 2430 n. 23; *Gay v. Waiters' & Dairy Lunchmen's Union*, 694 F.2d 531, 537 (9th Cir.1982) (holding that a prima facie case of racial discrimination under § 1981 requires proof of intentional discrimination); *Pryor v. NCAA*, 288 F.3d 548, 569–70 (3d Cir.2002) (confirming that a plaintiff must show purposeful discrimination when establishing a violation of § 1981).

**20.** Congress enacted Title VI "to make sure that funds of the United States are not used to support racial discrimination." 110 Cong. Rec. 7062 (1964) (statement of Sen. Pastore), *quoted in Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 n. 36, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); *accord United Steelworkers of Am. v. Weber*, 443 U.S. 193, 207 n. 6, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). It operates by "conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998).

**21.** Plaintiff quotes *General Building Contractors* to support the proposition that § 1981 must be applied to private actors in the same manner that the Equal Protection Clause is applied to government action. *See* (Plaintiff's Reply at 7 ("'In light of the close connection

*Grutter,* 539 U.S. at ——, 123 S.Ct. at 2347 (stating, in a case involving a state operated school also subject to Title VI, that "the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause" (citing *Gen. Bldg. Contractors,* 458 U.S. at 389–91, 102 S.Ct. 3141)); *Bakke,* 438 U.S. at 284, 98 S.Ct. 2733 (stating that "the voluminous legislative history of Title VI reveals a congressional intent to halt federal funding of entities that violate a prohibition of racial discrimination similar to that of the Constitution"). Accordingly, school admissions policies or other contracts challenged under § 1981 in these cases involving governmental institutions or private institutions receiving federal funding must withstand strict scrutiny analysis, i.e. the policy must employ "'narrowly tailored measures that further compelling government interests.'" *See, e.g., Gratz,* 539 U.S. at ——, 123 S.Ct. at 2427 (quoting *Adarand,* 515 U.S. at 227, 115 S.Ct. 2097).

■ By contrast, in cases involving private employers, courts apply § 1981 under an entirely different framework, namely the McDonnell Douglas burden shifting scheme as applied in cases involving racially discriminatory disparate treatment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (2000). *E.g., Patterson,* 491 U.S. at 181, 186, 109 S.Ct. 2363 (confirming both the existence of "some necessary overlap between Title VII and § 1981, and also the applicability of the McDonnell Douglas scheme of proof to a § 1981 case"); *Thompson v. Potomac Elec. Power Co.,* 312 F.3d 645, 649 n. 1 (4th Cir.2002) (noting that "the elements required to establish a prima facie case are the same under Title VII and [§ ] 1981" when affirming the decision of the district court to consider the claims together); *McCowan v. All Star Maint., Inc.,* 273 F.3d 917, 921–22 (10th Cir.2001) (stating that establishing a prima facie case requires the same "legal construct" under either Title VII or § 1981); *Anderson v. Douglas & Lomason Co.,* 26 F.3d 1277, 1284 n. 7 (5th Cir.1994) (explaining that the elements of a § 1981 claim are identical to those of a Title VII claim when justifying its use of "only one analysis in evaluating the plaintiff's Title VII and § 1981 claims"); *Wilson v. Legal Assistance,* 669 F.2d 562, 563 (8th Cir.1982) (stating that "[t]he standards to be applied in evaluating a claim of racial discrimination in employment [under § 1981] are the same as those applied in actions brought pursuant to Title VII"); *Setser,* 657 F.2d

between [the Reconstruction-era civil rights laws] and the [Fourteenth] Amendment, it would be incongruous to construe the principal object of their successor, § 1981, in a manner markedly different from that of the Amendment itself.'" (alteration in original) (quoting *Gen. Bldg. Contractors,* 458 U.S. at 389–90, 102 S.Ct. 3141))). However, examination of the passage in context reveals that the Supreme Court was explaining its construction of § 1981 as requiring purposeful discrimination to establish a violation, and not merely disparate impact. *Gen. Bldg. Contractors,* 458 U.S. at 389–90 & n. 17, 102 S.Ct. 3141.

Plaintiff similarly misplaces his reliance on *Pryor,* 288 F.3d 548. *See* (Plaintiff's Reply at 7–8 (citing *Pryor,* 288 F.3d at 569)). *Pryor*

involved the National Collegiate Athletic Association ("NCAA"), a "voluntary association of more than a thousand members, mostly consisting of public and private four-year universities." *Pryor,* 288 F.3d at 553, 559. The claims in that case involved not only § 1981, but also *Title VI.* 288 F.3d at 552. Furthermore, the *Pryor* court's discussion of strict scrutiny is dicta—the Third Circuit expressly stated that the issue before it was whether the plaintiffs sufficiently alleged that the NCAA intentionally discriminated against black athletes, not the application of strict scrutiny. *Id.* at 563; *see id.* at 559 (stating that the court would "treat this appeal as if [it] were reviewing the grant of a [12(b)(6) ] motion to dismiss").

962 (determining that the Title VII affirmative action analysis applied equally to § 1981).

Courts reasonably do not apply the Equal Protection standard to truly private actors because the Equal Protection and Due Process guarantees of the Fifth and Fourteenth Amendments apply only to government action. *Single Moms, Inc. v. Mont. Power Co.*, 331 F.3d 743 (9th Cir. 2003); *Farese v. Scherer*, 342 F.3d 1223, 1233 n. 13 (11th Cir.2003); *Medical Inst. v. Nat'l Ass'n of Trade & Technical Sch.*, 817 F.2d 1310, 1312 (8th Cir.1987); *see also Patterson*, 491 U.S. at 188, 109 S.Ct. 2363 (noting that the "the ordinance of the Constitution does not directly extend" to the area of private discrimination).

In this case, Kamehameha Schools is a private institution that does not receive federal funding, unlike the University of Michigan undergraduate or law schools involved in *Gratz* and *Grutter*. Logic thus dictates that although not entirely analogous to a private school's race-conscious remedial admissions policy, the Title VII/ § 1981 private employment framework provides the most appropriate guidance.[22]

## II. *Section 1981 Permits Justifiable Race–Conscious Policies*

██ Under the Title VII/ § 1981 private employment framework, race-conscious remedial plans may serve a legitimate purpose and therefore rebut the inference of racial discrimination raised by establishment of a prima facie violation of § 1981 or Title VII.[23] *See, e.g., Setser*, 657 F.2d at 965–68. In the seminal case of *United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480, the Supreme Court upheld a private employment affirmative action plan that was challenged under Title VII. Observing that the Act's prohibition against racial discrimination must be read against both the background of its legislative history and the historical context from which it arose, the *Weber* Court held that "an interpretation of the sections that [would forbid] all race-conscious affirmative action would 'bring about an end completely at variance with the purpose of the statute' and must be rejected." *Id.* at 201–202, 99 S.Ct. 2721 (citations omitted). It further concluded that:

It would be ironic indeed if a law triggered by a Nation's concern over centu-

**22.** No reported case addresses a race-conscious remedial admissions policy of a private school that receives no federal funding, especially one involving an educational preference for descendants of an indigenous people who have been disadvantaged by past history. The parties agree that this is a case of first impression.

Although *Runyon* involved private, commercially operated, nonsectarian schools, the case did not involve remedial admissions policies: the plaintiffs were explicitly informed in one instance that "only members of the Caucasian Race were accepted," and in another that the school was not integrated. *Runyon*, 427 U.S. at 165, 96 S.Ct. 2586; *accord Darensbourg v. Dufrene*, 460 F.Supp. 662, 664 (E.D.La.1978). Accordingly, *Runyon* and *Darensbourg* are inapposite as to the validity

of Kamehameha Schools' admissions policy as a race-conscious remedial program. At the same time, cases that discuss race-conscious remedial admissions policies invariably have involved schools that receive federal or state funding and are likewise inapposite. *E.g., Grutter*, 539 U.S. 306, 123 S.Ct. 2325; *Gratz*, 539 U.S. 244, 123 S.Ct. 2411; *Bakke*, 438 U.S. 265, 98 S.Ct. 2733; *Hunter ex rel. Brandt v. Regents of Univ. of Cal.*, 190 F.3d 1061 (9th Cir.1999); *Hopwood v. Texas*, 236 F.3d 256 (5th Cir.2000).

**23.** The Court notes that the cases discussed *infra* all involve employment discrimination contexts; which as stated *supra*, provide the most appropriate guidance, even though not entirely analogous to the matter of a private school's race-conscious remedial admissions policy.

ries of racial injustice and intended to improve the lot of those who had "been excluded from the American dream for so long," constituted the first legislative prohibition of all voluntary, private, race-conscious efforts to abolish traditional patterns of racial segregation and hierarchy.

*Id.* at 204, 99 S.Ct. 2721 (citation omitted) (quoting 110 Cong. Rec. 6552 (1964) (remarks of Sen. Humphrey)). As explained in *Johnson v. Transportation Agency,* 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987), under the McDonnell Douglas framework:

> Once a plaintiff establishes a prima facie case that race or sex has been taken into account in an employer's employment decision, the burden shifts to the employer to articulate a nondiscriminatory rationale for its decision. *The existence of an affirmative action plan provides such a rationale.* If such a plan is articulated as the basis for the employer's decision, the burden shifts to the plaintiff to prove that the employer's justification is pretextual and the plan is invalid.

*Id.* at 626, 107 S.Ct. 1442 (emphasis added).

In 1981, building on the foundation set by *Weber,* the Eighth Circuit determined that § 1981 did not prohibit all race-conscious affirmative action and that the standards for reviewing affirmative action under Title VII also govern review of such plans under § 1981. *Setser,* 657 F.2d 962. When explaining its decision, the *Setser* court expanded on the Supreme Court's statement in *Weber:*

> It would indeed be more ironic if the Civil Rights Act of 1866 [ (§ 1981) ] was used now to prohibit the only effective remedy for past discriminatory employ-

ment practices against blacks and other minorities, when the Act was virtually useless to prevent the occurrence of such discrimination for more than a century.

*Id.* at 966. It further explained that "[t]he prohibition under [§ ] 1981 of affirmative action plans permissible under [T]itle VII would bar a remedy Congress left within the discretion of private employers when it passed [T]itle VII." *Id.* at 967. Accordingly, as explained by the *Setser* court: "The first burden on the employer in a reverse discrimination suit is to produce some evidence that its affirmative action program was a response to a conspicuous racial imbalance in its work force and is remedial," *id.* at 968, and "[t]he second burden ... is to produce some evidence that its affirmative action plan is reasonably related to the plan's remedial purpose." *Id.;* accord *Johnson v. Transp. Agency,* 770 F.2d 752, 755 (9th Cir.1984) (approving the Eighth Circuit's statement of the burden placed on a defendant in a reverse discrimination suit). Once an employer produces evidence that its treatment of the plaintiff was a direct consequence of a bona fide affirmative action plan, the employer is entitled to judgment unless the plaintiff shows that the plan is invalid.[24] *Setser,* 657 F.2d at 969, (*cited in Johnson,* 770 F.2d at 755).

### III. *Kamehameha Schools' Admissions Policy Comprises a Valid Race-Conscious Remedial Plan*

Plaintiff argues that Kamehameha Schools' admissions policy is not a valid affirmative action plan, and therefore cannot rebut the inference of racial discrimination. In essence, Plaintiff asks this Court to strictly adhere to the private *employment* affirmative action framework.

---

**24.** As noted *supra,* throughout the entire reverse discrimination/affirmative action proceeding, the ultimate burden of persuasion remains on the plaintiff.

However, such a narrow lens forces the inquiry to ignore the unique historical context which surrounds Kamehameha Schools, a private *educational* institution. *See Grutter,* 539 U.S. at —, 123 S.Ct. at 2338, (stressing the importance of context, even for courts applying strict scrutiny review to "race-based governmental action under the Equal Protection Clause"); *Weber,* 443 U.S. at 201–208, 99 S.Ct. 2721 (examining the overall context closely when determining that Title VII did not prohibit race-conscious affirmative action programs); *supra* note 4. The Court again notes that the matter before it presents a unique historical background, which includes the history of Hawaii and Native Hawaiians; congressional recognition of the United States' wrongful involvement in the end of the Hawaiian Monarchy and the need to improve educational opportunities for Native Hawaiians; and the history of Kamehameha Schools and its unique role in the education of Native Hawaiians. *See supra* Background. Kamehameha Schools' has implemented a comprehensive affirmative action plan in pursuit of its mission to redress the continuing marginalization of the Native Hawaiians. This comprehensive plan includes Kamehameha Schools' admissions policy and educational programs.

Furthermore, in *Weber,* the seminal case involving an affirmative action plan in the private employment sector, the Supreme Court carefully conditioned its ruling by stating that

> We need not today define in detail the line of demarcation between permissible and impermissible affirmative action plans. It suffices to hold that the challenged Kaiser–USWA affirmative action plan falls on the permissible side of the line. The purposes of the plan mirror those of the statute. Both were designed to break down old patterns of racial segregation and hierarchy ...."

443 U.S. at 208, 99 S.Ct. 2721. Thus, the *Weber* Court explicitly declined to set forth a rigid standard for analyzing race-conscious remedial programs.

Likewise, when deciding *Setser,* which also involved a private employer, the Eighth Circuit recognized that there "is no bright line distinction between permissible and impermissible affirmative action plans. A flexible evaluation of the particular method adopted is appropriate." 657 F.2d at 969–70. The *Setser* court also recognized that "[t]here is no fixed formula for the type or nature of the evidence sufficient" to establish a legitimate race-conscious remedial program. *Id.* at 968; *accord Johnson,* 770 F.2d at 757 (noting explicitly that "[t]he *Weber* Court did not establish a rigid formula for testing the validity of an affirmative action plan").

■ This case involves a private educational institution. Unlike the affirmative action program of a private employer, which seeks to include under-represented individuals into the employer's workforce and therefore has an inherently internal focus,[25] Kamehameha Schools' goal is to foster the inclusion of people of Native Hawaiian ancestry, as a whole, into society by means of education—its mission has an inherently external focus. For example, the educational programs funded under

---

**25.** The Supreme Court does not require past discrimination by an employer to justify the employer's implementation of a race-conscious remedial affirmative action plan. *E.g., Johnson,* 480 U.S. at 630, 107 S.Ct. 1442 ("As Justice BLACKMUN's concurrence made clear, *Weber* held that an employer seeking to justify the adoption of a plan need not point to its own prior discriminatory practices, nor even point to its evidence of an 'arguable violation' on its part." (citing 443 U.S. at 212, 99 S.Ct. 2721 (Blackmun, J., concurring))). Furthermore, as discussed, although the private employment affirmative action model provides guidance, it is not entirely applicable to Kamehameha Schools.

the NHEA have an inherently external focus—to authorize and develop innovative, community-wide educational programs to assist Native Hawaiians—reflecting the needs and under-representation of Native Hawaiians outside of any specific school. *See* 20 U.S.C. §§ 7511–7517. The Court accordingly determines that it must analyze the Kamehameha Schools' admissions policy in context with the unique circumstances surrounding Kamehameha Schools, including its formation and mission.

As discussed *supra*, Trustee Chairman Bishop explained the intentions of his wife, Princess Pauahi in his 1888 Founder's Day address, in which he concluded, "in order that her own people might have the opportunity for fitting themselves with such competition ... these schools were provided for, in which Hawaiians have the preference." (Makanani Decl. ¶ 109.) The Court reiterates its finding that this statement represents the core of the Kamehameha School's mission. In pursuit of this mission, Kamehameha Schools has not only identified the disadvantages and under-representation faced by Native Hawaiians, but has also identified specific goals for its comprehensive remedial plan. *See Johnson*, 480 U.S. at 622, 635, 107 S.Ct. 1442 (affirming an employer's establishment of goals sought by an affirmative action plan); *Weber*, 443 U.S. at 199, 208, 99 S.Ct. 2721 (affirming a private employer's goal of ending imbalances when establishing a race-conscious affirmative action plan).

The statistical evidence provided by Defendants demonstrates the exclusion and marginalization of Native Hawaiians and thus the need for Kamehameha Schools' comprehensive remedial program. *Supra* Background Part I.C (discussing the effect of western influence on the Native Hawaiians); *see, e.g., Johnson*, 480 U.S. at 621–22, 107 S.Ct. 1442 (affirming an employer's use of statistical evidence to establish the

need for an affirmative action plan); *accord Weber*, 443 U.S. at 198, 99 S.Ct. 2721. Exposure to infectious diseases after western contact caused the Native Hawaiian population to plummet from a number estimated in the hundreds of thousands to only 22,000 in 1919. (Makanani Decl. ¶ 12); *Rice*, 528 U.S. at 500, 120 S.Ct. 1044; (Kanaiaupuni Decl. ¶ 30). The imposition of western systems and values caused further marginalization of the remaining Native Hawaiians. (Benham Decl. ¶¶ 31–39); (Makanani Decl. ¶¶ 34, 36, 96–100). At present, "Native Hawaiians are among the most disadvantaged ethnic groups in the State of Hawai'i." (Kanaiaupuni Decl. ¶¶ 12, 50–55, 115, 130–37); From Mauka to Makai, *supra* 1–2; (Benham Decl. ¶ 71).

 Moreover, these manifest imbalances and disadvantages identified by Kamehameha Schools are identical to those recognized by Congress. *See* 20 U.S.C. § 7512; 42 U.S.C. § 11701; *supra* Background Part I.D (discussing congressional recognition of the adversity faced by Native Hawaiians; *cf., e.g., Valentine*, 654 F.2d at 509 (stating that congressional findings could justify the need for a race-conscious remedy under Equal Protection)). *Compare* 20 U.S.C. § 7512 *with* (Ing Decl. ¶ 27–35) *and* Kamehameha Schools, Policy Analysis and System Evaluation, Report No. 02–03:13, Left Behind? The Status of Hawaiian Students in Hawai'i Public Schools (2003) (Attachment "B" to Ing Decl.). By enacting the NHEA and the multitude of other laws for the exclusive benefit of Native Hawaiians, *see infra* note 29, Congress sought to address the very specific impact of western civilization upon Native Hawaiians, with Congress having determined that the United States wrongfully participated in the demise of the Hawaiian Monarchy; rather than focusing on generalized societal dis-

crimination.[26] Apology Resolution, *supra;* 20 U.S.C. §§ 7511–7517 (NHEA); 42 U.S.C. §§ 11701–11714 (NHHCIA). In particular, when enacting and re-enacting the NHEA, Congress recognized the extreme disparities and educational risk factors faced by Native Hawaiians. 20 U.S.C. § 7512. Congress established educational programs exclusively for the benefit of Native Hawaiian students, which included financial assistance for pursuing higher education, grants and contracts to serve the needs of gifted and talented students in elementary and secondary schools, and funding for special education programs. 20 U.S.C. § 7515. In the Act, Congress defined "Native Hawaiian" broadly to include any descendant of the aboriginal people who occupied and exercised sovereignty in Hawaii prior to 1778, essentially the same definition used by Kamehameha Schools. *Compare* 20 U.S.C. § 7517 *with* (Makuakane–Drechsel Decl. ¶ 3). Congress furthermore explicitly recognized the important role played by Kamehameha Schools as a Native Hawaiian educational institution.

The House Committee on Education and the Workforce, in its May 14, 2001 House Report, stated that

unlike other indigenous populations, Native Hawaiians have a trust, established by the last Hawaiian Princess, which exists *solely to educate native Hawaiian children.* The Bishop Trust is currently one of the largest charitable trusts in the world .... *The Committee urges the Trust to redouble its efforts to educate native Hawaiian children.*

H.R.Rep. No. 107–63(I), at 732 (2001) (emphasis added). Although this statement does not constitute law, and was expressed to explain the recommendation by the Committee to discontinue the NHEA (which was reinstated during conference with the Senate), this declaration evidences Congress's awareness that Kamehameha Schools' mission coincides with the goals of the NHEA. Congress has thus acknowledged that notwithstanding its prior efforts to fulfill its special trust relationship with Native Hawaiians, there exists a continuing substantial need for educational assistance and that the parallel trust of Princess Pauahi establishing the Kamehameha Schools is a significant resource in meeting this need.

Through its unique "Leadership Model" of education, Kamehameha Schools seeks to address the imbalances, disadvantages and marginalization facing Native Hawaiians. *See* (Ing Decl. ¶ 60.); *supra* Background Part I.E. Kamehameha Schools' comprehensive education program "creat[es] a vibrant learning community of Native Hawaiian students that is free from stigmas," and provides an environment where "Native Hawaiian children learn better and develop a greater sense of self-

---

**26.** Likewise, Kamehameha Schools' remedial plan is not addressing generalized societal discrimination. Furthermore, although Plaintiff correctly states that remedying societal discrimination does not equate to a *compelling state interest* for the purposes of Equal Protection review (Plaintiff's Reply at 12 (quoting *Bakke,* 438 U.S. at 306, 310, 98 S.Ct. 2733; *Monterey Mech. Co. v. Wilson,* 125 F.3d 702, 713 (9th Cir.1997))), Kamehameha Schools is a private institution that receives no federal funding, and is not subject to strict scrutiny. *See supra* Discussion Part I. Furthermore, § 1981 is a remedial statute. *See*

*Runyon,* 427 U.S. 160, 96 S.Ct. 2586; *Jones,* 392 U.S. 409, 88 S.Ct. 2186; *see also Setser,* 657 F.2d at 967 (reading § 1981 harmoniously with Title VII when determining that § 1981 does not prohibit race-conscious affirmative action programs); *cf. Weber,* 443 U.S. at 201–207, 99 S.Ct. 2721 (describing Title VII as "a law triggered by a Nation's concern over centuries of racial injustice and intended to improve the lot of those who had 'been excluded from the American dream for so long'" (quoting 110 Cong. Rec. 6552 (1964) (remarks of Sen. Humphrey))).

esteem" because the program "embraces Native Hawaiian culture, reconnects the children with the values of respect and sharing that guided their ancestors, and builds their pride and senses of dignity." (Ing Decl. ¶ 71); *see* Kamehameha Schools, Policy Analysis and System Evaluation, Report No. 03–04:7, Educating Hawaiian Children: How the Learning Environment Matters (2003) (Attachment "G" to Ing Decl.); (Kanaiaupuni Decl. ¶¶ 220–229 (discussing empirical evidence from historically black colleges/universities and single-sex schools that supports Kamehameha Schools' program)); *cf. Grutter*, 539 U.S. at ——, 123 S.Ct. at 2358 (Thomas, J., dissenting) (stating that "[t]he [*Grutter* majority] never acknowledges, however, the growing evidence that racial (and other sorts) of [internal] heterogeneity actually impairs learning among black [college and university] students" (citing Lamont A. Flowers & Ernest T. Pascarella, Cognitive Effects of College Racial Composition After 3 Years of College, 40 J. of C. Student Dev. 669, 674 (1999); Walter R. Allen, The Color of Success: African–American College Student Outcomes at Predominantly White and Historically Black Public Colleges and Universities, 67 Harv. Educ. Rev. 26, 35 (1992))).

In pursuit of its mission, Kamehameha Schools' comprehensive remedial plan first aims to increase both "the achievement test scores of Native Hawaiian students," and "the number of Native Hawaiian students receiving college and advanced degrees." (Ing Decl. ¶ 60.) Achievement of this first goal allows Kamehameha Schools to achieve its second goal, to increase the diversity of civic, business, and philanthropic leadership and thereby accelerate redress of the under-representation of Native Hawaiians. (Ing Decl. ¶ 60); *see* (Declaration of Linda Lingle (Governor of the State of Hawaii (R)) ("Lingle Decl.") ¶ 12 ("Based upon my experience as a County Council member, Mayor, and Governor, I also believe that our state needs a qualified and racially and ethnically diverse group of leaders .... Kamehameha Schools provides an essential training ground for the education and development of our future Native Hawaiian leaders.")), *in* (Defendants' CSMF); *cf. Grutter*, 539 U.S. at —— – ——, 123 S.Ct. at 2340–41. ("Effective participation by members of all racial and ethnic groups in the civic life of our Nation is essential if the dream of one Nation, indivisible, is to be realized.").

Kamehameha Schools' overall educational plan also seeks to preserve the Native Hawaiian indigenous culture and identity. (Ing Decl. ¶¶ 44, 60, 71.) The importance of this preservation has been thus explained:

> In the case of an indigenous people, [such as the Native Hawaiians,] preservation of culture is essential to the very preservation of the people themselves. Physical survival is not enough. Key to the survival of this culture and people, to their very well-being, is remembering who they are, their identity, their ancestral connections to the land, and their way of viewing the world. Survival requires culturally fertile environments where they can regenerate their cultural connections and reestablish their sociocultural support systems once again. Thus, as the most revered [Native] Hawaiian institution of the state, Kamahameha [Schools] is vital to the survival of the [Native] Hawaiian people. It teaches Native Hawaiian students their culture and traditions, grounding them in their heritage and who they are as a people. This approach directly combats the experiences that Native Hawaiians would otherwise face in public schools.

(Kanaiaupuni Decl. ¶ 214); *see also* (Kanaiaupuni Decl. ¶¶ 232–40 (discussing the importance of cultural awareness and pride)); (Lingle Decl. ¶ 14 (stating that "[t]he Kamehameha Schools is a critical

institution in helping" to meet the responsibility of creating a place for the Hawaiian culture, "embodied in thousands of years of knowledge and tradition," to survive and flourish)).

Kamehameha Schools has achieved measurable success with its unique program. Seniors attending Kamehameha Schools outperform "both national norms and state averages on the SAT I verbal and math tests." (Kanaiaupuni Decl. ¶ 170.) An overwhelming majority of the Kamehameha Schools class of 2002 planned to attend a four-year college; nearly all planned to enroll in some form of post-secondary school. *Id.* ¶ 176. Graduates of Kamehameha Schools have distinguished themselves as contributors and leaders to both the State of Hawaii and the Native Hawaiian community. (Ing.Decl.¶¶ 66–68.) Kamehameha Schools thus sets forth specific goals for its comprehensive remedial plan to accomplish its mission of addressing the imbalances, disadvantages and marginalization facing Native Hawaiians.

Furthermore, the Kamehameha Schools' admissions preference is not a perpetual nor an absolute bar to admittance of other races. The founder of the Schools, Princess Bernice Pauahi Bishop left the discretion "to regulate the admission of pupils" to her Trustees. (Pauahi Will, *supra.*) The original Trustees, chaired by Princess Pauahi's widower, Charles R. Bishop, made known that it was her intent to give a preference to students of Hawaiian ancestry. (Makanani Decl. ¶ 107–13.) However, Mr. Bishop explained in a letter written February 11, 1897 that "there is nothing in the Will of Mrs. Bishop excluding white boys or girls from the Schools, but it is understood by the Trustees that only those having native blood are to be admitted *at present.*" *Id.* ¶ 110 (emphasis added) (quoting Kanahele, *supra,* at 177).

He further explained in a February 20, 1901 letter that "[e]ducation of the natives was the first, *but not the exclusive and perpetual purpose* of the Founder of the School." (Bishop Feb. 20, 1901 Letter, *supra* (emphasis added).) Mr. Bishop continued, stating that "it was wise to prepare for and admit Natives only and I do not think that *the time has yet come* when it is better to depart from that rule." *Id.* (emphasis added). Thus, the Kamehameha Schools Trustees, even when implementing the admissions preference, have contemplated its end.

Similar to Trustee Chairman Bishop's determination over a century ago that the Schools did not then have the capacity to include non-Native Hawaiians, today the Kamehameha Schools have only approximately 4,800 spaces in their campus programs while there are approximately 70,-000 Native Hawaiian children enrolled in grades K–12 throughout Hawaii. (Ing Decl. ¶ 74.) Consequently, even though Kamehameha Schools has made great strides over the years in expanding its capacity to provide an education for thousands of children in Hawaii, it still only reaches a fraction of the Native Hawaiian school-age population, and thus has insufficient capacity to admit non-Native Hawaiians.

Thus, at present, the need to provide educational opportunities for Native Hawaiian children far outstrips Kamehameha Schools' ability to provide those opportunities. *See* (Ing Decl. ¶¶ 69, 74); (Kanaiaupuni Decl. ¶ 12); From Mauka to Makai, *supra,* at 1–2. Presently, Kamehameha Schools' campus programs can only reach 7% of the Native Hawaiian school-age children in the State of Hawaii. (Ing.Decl.¶ 74.) Defendants recognize that despite Kamehameha Schools' "great success over the past 116 years, much remains to be done." [27] (Ing.Decl.¶ 69.)

---

**27.** Kamehameha Schools is but one of a mul-

titude of independent (private) schools oper-

Moreover, Defendants reviewed the admissions policy in 2002, and will continue to periodically review the policy to ensure that it is aligned with Kamehameha Schools' mission. (Ing Decl. ¶¶ 75–76); (Memorandum from Hamilton I. McCubbin, to Kamehameha Schools Trustees (April 17, 2003) (Attachment "C" to Ing Decl.)); see Johnson, 480 U.S. at 622, 635, 107 S.Ct. 1442 (specifically noting the periodic review conducted by the Santa Clara County Transportation Agency when upholding its race conscious remedial plan, which did not have an explicit deadline).

At the November 17, 2003 hearing, counsel for Defendants' stated that the plan would only last for so long as it took Kamehameha Schools to fulfill its responsibility in attaining the goal of educating Native Hawaiians to overcome the manifest imbalance in socioeconomic and educational imbalances. Accord (Ing Decl. ¶ 74 ("As long as the need for the Schools' K–12 campus-based educational experience exceeds Kamehameha's ability to offer it to all eligible Native Hawaiian children, the Policy will continue to be an essential component of Kamehameha's ability to achieve its objectives and to carry our Princess Pauahi's legacy.")). The Court takes Defendants at their word, as buttressed by their affirmative action plan and periodic review, that non-Native Hawaiians will be admitted when that goal is attained or at such earlier date when the schools have the capacity to also admit non-Native Hawaiians. See, e.g., Grutter, 539 U.S. at ——, 123 S.Ct. at 2346 (taking the University of Michigan Law School "at its word that it would 'like nothing better than to find a race-neutral admissions formula' and will terminate its race-conscious ad-

missions program as soon as practicable") (quoting Brief for Respondents Bollinger et al. at 34) (citing Bakke, 438 U.S. at 318–19, 98 S.Ct. 2733 (opinion of Powell, J.) ("presuming good faith of university officials in the absence of a showing to the contrary," Grutter, 539 U.S. at ——, 123 S.Ct. at 2346)).

Earlier this year, in June 2003, the Grutter Court recognized that the time to halt race-conscious remedial admissions programs in higher education had not arrived. Grutter, 539 U.S. at —— – ——, 123 S.Ct. at 2346–47; see also id. at —— – ——, 123 S.Ct. at 2347–48 (Ginsburg, J., concurring) ("It is well documented that conscious and unconscious race bias, even rank discrimination based on race, remain alive in our land, impeding realization of our highest values and ideas." (citing Gratz, 539 U.S. at —— – ——, 123 S.Ct. at 2442–44 (Ginsburg, J., dissenting))). Likewise, former Governor of the State of Hawaii, George R. Ariyoshi (D), stated:

I look forward to the fruits of Kamehameha Schools' efforts when it educates and develops so many good Hawaiian role models that future generations of Hawaiian children need not be reminded of failures but are inspired by success. I look forward to the day when Kamehameha Schools' admissions policy is no longer needed, when Native Hawaiians are at the top of every educational and socioeconomic class. But that day is not today.

(Declaration of George R. Ariyoshi ¶ 12 (emphasis added)), in (Defendants' CSMF). Furthermore, the Congressional

ating in the State of Hawaii. In 1992–1993, Native Hawaiian students represented 23.4% of the students in the Hawaii State Department of Education system (41,477 out of 177,109), while Native Hawaiian students represented only 21% of the students in inde-

pendent schools (6,877 out of 32,774). Kamehameha Schools Bernice Pauahi Bishop Estate Office of Program Evaluation and Planning, Report No. 99–00:9, Native Hawaiian Educational Assessment 1999 9 (1999) (Attachment "E" to Benham Decl.).

findings of the NHEA and the reports presented by Defendants, combined with the fraction of the Native Hawaiian population that Kamehameha Schools currently is able to reach, establish not only the continuing need for Kamehameha Schools to rely on its admissions preference, but also that its means reasonably relate to its quest to achieve the remedial goal of providing an education for the Native Hawaiian people.

Thus, Defendants establish the legitimacy of Kamehameha Schools' admissions policy as an integral part of its educational mission and comprehensive affirmative action plan.[28] The Court finds the plan has a legitimate justification and serves a legitimate remedial purpose by addressing the socioeconomic and educational disadvantages facing Native Hawaiians, producing Native Hawaiian leadership for community involvement, and revitalizing Native Hawaiian culture, thereby remedying current manifest imbalances resulting from the influx of western civilization. The Court makes this finding independent of whether or not the United States wrongfully participated in the overthrow of the Hawaiian Monarchy as determined by Congress. At present, Native Hawaiians continue to suffer from economic deprivation, low educational attainment, poor health status, substandard housing, and social dislocation. The plan furthermore is reasonably related to its remedial purpose, and does not unnecessarily trammel the rights of others. Its means are not excessive in light of the great need for Native Hawaiian education. Plaintiff does not overcome his burden of proving the plan invalid.

## IV. Section 1981 should be read harmoniously with congressional policy.

Plaintiff argues that Defendants ask this Court to determine that Congress has repealed § 1981 with respect to persons of Native Hawaiian ancestry. (Plaintiff's Reply at 17–20.) However, Defendants do not argue that § 1981 has been repealed by congressional enactments benefitting Native Hawaiians, but rather assert that § 1981 should be read in consonance with those statutes. (Defendants' Memo. at 78–85); (Defendants' Reply at 26–32).

Both parties agree that repeals by implication are disfavored. (Plaintiff's Reply at 18 (citing *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 468, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982))); (Defendants' Reply at 29 (citing *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974))). "[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Mancari*, 417 U.S. at 551, 94 S.Ct. 2474. Courts must interpret seemingly conflicting statutes to avoid the conflict and give effect to Congress's intent by examining the complete framework of related legislation. *Watt v. Alaska*, 451 U.S. 259, 266–67, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); *see also California v. United States*, 215 F.3d 1005, 1012–13 (9th Cir.2000) (admonishing that "courts are not at liberty to pick and choose among congressional enactments" (citing *Mancari*, 417 U.S. at 551, 94 S.Ct. 2474)). Congress is presumed to know its prior legislative acts

---

**28.** In view of the unchartered area of the law involved in this case, it is likely that the ultimate resolution will be made by a higher court. Nevertheless, this Court is firmly convinced that the Kamehameha Schools race-conscious remedial action plan has a legitimate justification. Because of this conviction, the Court finds it unnecessary to address the question of whether the admissions policy also satisfies the strict scrutiny standard.

and to pass new laws in view of the legislation it has previously enacted. *St. Louis, I.M. & S. Ry. Co. v. United States,* 251 U.S. 198, 207, 40 S.Ct. 120, 64 L.Ed. 225 (1920), *quoted in Owner–Operators Indep. Drivers Ass'n of Am., Inc. v. Skinner,* 931 F.2d 582, 586 (9th Cir.1991).

In *Weber,* the seminal case upholding a private employer's affirmative action plan under Title VII, the Supreme Court took special care to read the Act's prohibition against racial discrimination in light of both its legislative history and the historical context from which it arose. 443 U.S. at 201–08, 99 S.Ct. 2721; *accord Runyon,* 427 U.S. at 174–75, 96 S.Ct. 2586. It accordingly held that "an interpretation of the sections that [would forbid] all race-conscious affirmative action would 'bring about an end completely at variance with the purpose of the statute' and must be rejected." *Id.* at 201–02, 99 S.Ct. 2721. The *Weber* Court thus refused to construe a law enacted to "improve the lot of those who had 'been excluded from the American

dream for so long' " in a manner that would prohibit private employers from race-conscious remedial affirmative action programs. *Id.* at 204, 99 S.Ct. 2721 (quoting 110 Cong. Rec. 6552 (1964) (remarks of Sen. Humphrey), *quoted in Setser,* 657 F.2d at 966).

Based on the Supreme Court's interpretation of Title VII in *Weber,* the Eighth Circuit not only examined the legislative and historical contexts of § 1981, but also took great pain to read § 1981 and Title VII harmoniously when deciding *Setser.* 657 F.2d 962. In determining that § 1981, like Title VII, permitted the use of remedial, race-conscious affirmative action plans by private employers, the *Setser* court explained that "[t]o open the door for such plans under [T]itle VII and close it under [§ ] 1981 would make little sense." *Id.* at 967.

 Over the past some eighty years, Congress has enacted a multitude of legislation for the exclusive benefit of Native Hawaiians.[29] *See* (Declaration of Kelly G.

---

**29.** Over eighty-five congressional enactments provide preferences or services to Native Hawaiians. *See* ("LaPorte Decl."). The list of statutes which provide exclusive contractual or grant benefits to Native Hawaiians includes, inter alia:

the Native Hawaiian Education Act of 2002, Pub.L. No. 107–110, tit. VII, § 701, 115 Stat. 1425, 1932–42 (codified as 20 U.S.C. §§ 7511–7517 (Supp. I 2002));

the Hawaiian Homelands Homeownership Act of 2000, Pub.L. No. 106–568, tit. II, secs. 201–204, tit. VIII, §§ 801–24, 114 Stat. 2868, 2872–76, 2876–2903; Pub.L. No. 106–569, tit. V, secs. 511–14, tit. VIII, §§ 801–824, 114 Stat. 2944, 2966–69, 2970–97 (codified as 25 U.S.C. §§ 4221–4243 (2000)) (providing loan guarantees and other forms of housing assistance to Native Hawaiians);

the Department of Defense Appropriations Act of 1995, Pub L. No. 103–335, § 8127, 108 Stat. 2599, 2652 (1994) ("In entering into contracts with private entities to carry out environmental restoration and remedia-

tion of Kahoʻolawe Island ... the Secretary of the Navy shall ... give special preference to business owned by Native Hawaiians.");

the Act of Dec. 22, 1980, Pub.L. No. 96–565, §§ . 101–10, 94 Stat. 3321, 3321–23 (codified as 16 U.S.C. §§ 410jj to jj–9 (2000)) (stating that the Secretary of the Interior "shall give preference to ... Native Hawaiians in making appointments to positions" established for the administration of Kalaupapa National Historical Park, and shall "provide training opportunities for ... Native Hawaiians to develop skills");

and

the Native Hawaiian Health Care Act of 1988 ("NHHCA") (now entitled the Native Hawaiian Health Care Improvements Act), Pub.L. No. 100–579, 102 Stat. 2916; Pub.L. No. 100–690, §§ 2301–2312, 102 Stat. 4181, 4222–4230 (codified as amended at 42 U.S.C. §§ 11701–11714 (2000)) (providing benefits directly and exclusively to both Native Hawaiians and to organizations serving Native Hawaiians); *see Burgert,* 200 F.3d at 663 (discussing the NHHCA). *See* (LaPorte Decl.).

LaPorte ("LaPorte Decl.")), *in* (Defendants' CSMF). In these enactments, Congress has recognized a special trust obligation and political relationship with Native Hawaiians.[30] Congress has further decided the United States wrongfully participated in the demise of the Hawaiian Monarchy. Apology Resolution, *supra;* 20 U.S.C. §§ 7511–7517 (NHEA); 42 U.S.C. §§ 11701–11714 (NHHCIA). Furthermore, § 1981 was amended in 1991, at virtually the same time that Congress authorized programs for the education of Native Hawaiians in 1988, and enacted the NHEA in 1994. Civil Rights Act of 1991, Pub.L. No. 102–166, tit. I, § 101, 105 Stat. 1071, 1071–72 (amending 42 U.S.C. § 1981); Augustus F. Hawkins–Robert T. Stafford Elementary and Secondary School Improvements Amendments of 1988, Pub.L. No. 100–297, tit. IV, §§ 4001–4008, 102 Stat. 130, 358–63 (Education for Native Hawaiians); Improving America's Schools Act of 1994, Pub.L. No. 103–382, tit. IX, §§ 9201–9212, 108 Stat. 3518, 3794–3805 (1994 NHEA). Congress moreover explicitly recognized the important role played by Kamehameha Schools as a Native Hawaiian educational institution, as evidenced by the May 14, 2001 House Report by the House Committee on Education and the Workforce. *See* H.R.Rep. No. 107–63(I), at 732.

The application of § 1981 to the Kamehameha Schools' remedial affirmative action plan should be considered in light of and in harmony with Congress's determination that the United States wrongfully participated in the overthrow of the Hawaiian Monarchy, and with its proclamation of a policy of reconciliation with the Native Hawaiian people and the numerous laws enacted for their exclusive benefit. Section 1981 is a *remedial* statute. *E.g., Runyon,* 427 U.S. 160, 96 S.Ct. 2586; *Jones,* 392 U.S. 409, 88 S.Ct. 2186; *see supra* note 26. Like the *Setser* court noted when reading § 1981 harmoniously with Title VII, it would indeed make little sense for Congress to open the door with remedial programs that preference Native Hawaiians, yet have it simultaneously shut by § 1981 with respect to Kamehameha Schools' similar remedial plan. 657 F.2d at 966–67; *accord Weber,* 443 U.S. at 201–207, 99 S.Ct. 2721.

## *CONCLUSION*

In sum, the Court reiterates that this case involves exceptionally unique circumstances involving a private school, which receives no federal funding, with a remedial race-conscious admissions policy to rectify socioeconomic and educational disadvantages of indigenous Native Hawaiians resulting from the influx of western civilization. Congress, having determined the United States wrongfully participated in the overthrow of the Hawaiian Monarchy and having declared that the United States has a special trust relationship with Native

---

**30.** Plaintiff does not challenge any congressional enactment. Thus, the constitutionality of any statute cited by Defendants must be presumed. *Reno v. Condon,* 528 U.S. 141, 148, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000) (quoting *Close v. Glenwood Cemetery,* 107 U.S. 466, 475, 2 S.Ct. 267, 27 L.Ed. 408 (1883) ("Every legislative act is presumed to be a constitutional exercise of legislative power until the contrary is clearly established ....")) (citing *INS v. Chadha,* 462 U.S. 919, 944, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983)); *see also Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985) (stressing that federal courts " 'ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable' " (quoting *Spector Motor Serv. v. McLaughlin,* 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944)); *cf. Rice,* 528 U.S. at 521–22, 120 S.Ct. 1044 (assuming "the validity of the underlying administrative structure and trusts, [created by the State of Hawaii for the exclusive benefit of Native Hawaiians,] without intimating any opinion on that point")).

Hawaiians, has made legislative findings setting forth these same disadvantages and sought to remedy them. Congress further recognized that Kamehameha Schools' admissions policy and educational program are a means of attaining such remedial goals, with a House Committee Report urging Kamehameha Schools to redouble its efforts.

For the foregoing reasons, the Court finds there are no genuine issues of material fact, and DENIES Plaintiff's Motion for Partial Summary Judgment with Respect to Declaratory and Injunctive Relief, and GRANTS Defendants' Counter–Motion for Summary Judgment.

IT IS SO ORDERED.