GRABER, Circuit Judge,
concurring in part and dissenting in part:
I respectfully dissent from the majority’s conclusion that 42 U.S.C. § 1981 bars the admissions policy of the Kamehameha Schools. Our only task is to discern Congress’ intent with respect to the application of § 1981 to a wholly private, Hawaiian institution that educates Native Hawaiian children in Hawaii. Although I have no quarrel with many of the general principles set forth so gracefully in the majority opinion — and, indeed, I concur in the opinion insofar as it applies Title VII principles, rather than strict scrutiny, to admissions preferences by a private school — I cannot agree with the opinion’s narrow perspective on congressional intent.
When Congress first enacted § 1981 in 1866, the Hawaiian Islands were still a sovereign kingdom. But in 1991, when Congress revisited and reenacted § 1981 in the Civil Rights Act of 1991, Pub.L. No. 102-166, § 101, 105 Stat. 1071, Congress’ view of the statute’s proper scope presumptively was informed by the body of law that had developed in the interim. See Miles v. Apex Marine Corp., 498 U.S. 19, 32, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990) (“We assume that Congress is aware of existing law when it passes legislation.”); 1A Norman J. Singer, Sutherland Statutory Construction § 23.10, at 487 (6th ed.2002) (describing the doctrine that “the legislature is presumed to envision the whole body of the law when it enacts new legislation”). It is our duty to harmonize § 1981, to the extent possible, with the statutory context in which Congress acted. See Watt v. Alaska, 451 U.S. 259, 267, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981) (“We must read [apparently conflicting] statutes to give effect to each if we can do so while preserving their sense and purpose.”); *1049 Morton v. Mancari, 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (“[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.”).
In 1988, just three years before its reenactment of § 1981, Congress recognized the United States government’s unique relationship with Native Hawaiians, acknowledged the severe socioeconomic and educational disadvantages experienced by Native Hawaiians, and authorized federal money for private entities' — including the Kamehameha Schools — to provide loans and scholarships exclusively to Native Hawaiians. For example, Congress found, in the Native Hawaiian Health Care Act of 1988, Pub.L. No. 100-579, § 2(2) 102 Stat. 2916, that the federal government’s contributions to improving the health of Native Hawaiians “are consistent with the historical and unique legal relationship of the United States with the government that represented the indigenous native people of Hawaii.”
Congress spoke particularly, and at length, to the educational needs of Native Hawaiians in the Augustus F. Hawkins-Robert T. Stafford Elementary and Secondary School Improvement Amendments of 1988 (“Hawkins-Stafford Amendments”), Pub.L. No. 100-297, tit. IV, § 4001 (“Education for Native Hawaiians”), 102 Stat. 130:
The Congress finds and declares that—
(1) the Federal Government retains the legal responsibility to enforce the administration of the State of Hawaii’s public trust responsibility for the betterment of the conditions of Native Hawaiians;
(2) in furtherance of the responsibility for the betterment of the conditions of Native Hawaiians, Congress has the power to specially legislate for the benefit of Native Hawaiians;
(3) .the attainment of educational success is critical to the betterment of the conditions of Native Hawaiians;
(4) it is the policy of the Federal Government to encourage the maximum participation of Native Hawaiians in the planning and management of Native Hawaiian Education Programs;
(9) special efforts in education recognizing the unique cultural and historical circumstances of Native Hawaiians are required.
20 U.S.C. § 4901 (1991) (repealed 1994).[1]
Having made those findings, Congress specifically directed the Secretary of Education to “make grants to the Kamehameha Schools/Bernice Pauahi Bishop Estate”' — -that is, to the Defendants in this case — “for a demonstration program to provide Higher Education fellowship assistance to Native Hawaiian stvidents.” 20 U.S.C. § 4905(a) (1991) (repealed 1994) (emphasis added).[2] The sole beneficiaries *1050 of this federal fellowship assistance were to be “Native Hawaiian,” a term that was defined in the statute — as it is in the Kamehameha Schools’ admission policy— to mean “a descendant of the aboriginal people, who prior to 1778, occupied and exercised sovereignty in the area that now comprises the State of Hawaii.” 20 U.S.C. § 4909(1)(C) (1991) (repealed 1994). Compare id. with Doe v. Kamehameha Schs./Bernice Pauahi Bishop Estate, 295 F.Supp.2d 1141, 1156-57 (D.Haw.2003) (describing the Schools’ admissions policy).
That exclusive educational preference for Native Hawaiians, which was motivated by the need to remedy abysmal socioeconomic and educational conditions and by the United States government’s unique relationship with and responsibility for Native Hawaiians, was part of the statutory context into which § 1981 was reenacted. Having just adopted this private, remedial, exclusive preference for Native Hawaiians, Congress could not have intended for § 1981 to bar, categorically, every private program that provides an exclusive preference to Native Hawaiians. And, for that reason, I disagree that the mere fact that Kamehameha Schools grants an exclusive preference to Native Hawaiian applicants is dispositive of this case. Indeed, the inescapable conclusion from the statutory context is that in 1991 Congress intended that a preference for Native Hawaiians, in Hawaii, by a Native Hawaiian organization, located on the Hawaiian monarchy’s ancestral lands, be upheld because it furthers the urgent need for better education of Native Hawaiians, which Congress had identified explicitly in 1988.
The majority holds that § 1981 forbids all exclusive racial preferences (whether remedial or not) and suggests that political status is the only alternative justification for the Schools’ exclusive preference for Native Hawaiians. See maj. op. at 1041-42. Thus, the Schools’ concession that “Native Hawaiian” is a racial category, for purposes of this case, dooms its policy under the majority’s view. See maj. op. at 1045-47. I do not perceive such a dichotomy between the racial and the political aspects of the Schools’ preference for Native Hawaiian applicants. That is, if “Native Hawaiian” is indeed a racial category, then Congress has shown by its actions that an exclusive, remedial, racial preference can be permissible, at least when it is employed to remedy demonstrable and extreme educational and socioeconomic deficiencies that are faced by a racial group that (a) is descended from people whose sovereignty and culture were upended and nearly destroyed, in part by the actions of the United States, and (b) consequently enjoys a special trust relationship with the United States government that parallels (but is not identical to) that between the federal government and Native Americans. These factors distinguish Native Hawaiians from the other racial groups mentioned by the majority, see maj. op. at 1043-44, who have received special funding. In other words, we need not decide that Native Hawaiians have any particular political status in order to recognize, as Congress has, that the Kamehameha Schools pursue unique remedial objectives and may, consistent with congressional intent, employ special remedial tools.
The Supreme Court has not established “a rigid formula for testing the validity of an affirmative action plan” applied by a private employer, Johnson v. Transp. Agency, 770 F.2d 752, 757 (9th Cir.1985), nor has it spoken at all to the operation of § 1981 with respect to remedial preferences at a private school. In the absence of more specific Supreme Court guidance, *1051 we should look directly to congressional intent. Congress clearly meant to allow for the private education of Native Hawaiian children at the Kamehameha Schools. Because the statutory context demonstrates that Congress did not intend for § 1981 to bar all exclusive preferences to remedy the severe educational deficits suffered by Native Hawaiians, a population unique within this country, and because Kamehameha Schools has amply demonstrated that its admission preference is regularly reviewed and currently required to combat those deficits, I respectfully dissent from the majority’s contrary conclusion.

. Even though the quoted sections were repealed in 1994, they signal Congress' sustained intent. First, the statutes were in effect in 1991 when Congress re-enacted § 1981. Second, Congress has continued throughout the years to make similar findings about the unique educational needs of Native Hawaiian children and the unique relationship between the United States government and the Native Hawaiian people. See, e.g., 20 U.S.C. § 7512. Congress also has continued to authorize funds for educational programs serving Native Hawaiian children. See, e.g., id. § 7515.

. In 1987, a year before the enactment of the Hawkins-Stafford Amendments, Congress h'ad provided funds for a "Native Hawaiian organization” to "make loans to Native Hawaiian organizations and to individual Native Ha-waiians for the purpose of promoting economic development in the State of Hawaii.” Native American Programs Act Amendments *1050 of 1987, Pub.L. No. 100-175, tit. V, § 506(a), 101 Stat. 926 (emphasis added).